**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

CASE NO. 12-1917
_____

EASTHAMPTON SAVINGS BANK, CHICOPEE SAVINGS BANK,
HAMPDEN BANK, UNITED BANK, MONSON SAVINGS BANK, COUNTRY
BANK FOR SAVINGS
*PLAINTIFFS-APPELLANTS,*
vs.
CITY OF SPRINGFIELD,
*DEFENDANT-APPELLEE.*
_____

ON APPEAL FROM A JUDGMENT OF UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS.
[C.A No.: 11-CV-30280-MAP]
_____

**BRIEF OF THE DEFENDANTS-APPELLEE,**
**CITY OF SPRINGFIELD.**
_____

Respectfully submitted,

The Defendant/Appellee
City of Springfield
By its attorneys

/s/ Thomas D. Moore_____
Thomas Moore,; Bar No: 1154107
Edward Pikula, Esq.; Bar No: 399770
Anthony Wilson, Esq.; Bar No: 1157353
City of Springfield
Law Department
36 Court Street
Springfield, MA  01103
TEL (413) 787-6085
FAX (413) 787-6173

i

# TABLE OF CONTENTS

Table of Authorities …………………………………………………………….    iii

Statement of the Case …………………………………………………………    1

Statement of the Facts …………………………………………………………    2

Summary of the Argument ……………………………………………………    5

Argument

I.     A. The Ordinances are not preempted by any Massachusetts Laws, as: (a) no express prohibition against such local legislative action is contained within any state laws or regulations, and (b) the Ordinances are not in sharp conflict with and do not frustrate the legislative purpose of any state statutes.
       B. The Ordinances are consistent and work in cooperation with existing state laws, containing specific provisions to ensure that no conflicts or inconsistencies with established laws or regulations are present. As such, a challenge to the validity of the Ordinances on preemption grounds is without merit. ………………………………....    7

II.    (A)  The Ordinances do not violate the Contracts Clause of the U.S. Constitution, as they do not significantly impair mortgage obligations and further a significant and legitimate public government purpose. (B) The Ordinances are reasonably tailored to meet the long recognized important government interest of protecting the health and safety of the community, a basic societal interest.    27

III.   The Foreclosure Ordinance Bond requirement does not amount to an illegal tax, but is a proper fee as: (a) it is a deposit, returned to the registrant upon completion of the foreclosing entity's involvement at the property; (b) a very small percentage of the Bond amount is kept by the City as an administrative fee to offset the costs associated with the maintenance and registration program under the Foreclosure Ordinance, (c) Mortgagees submitting Bond deposits and paying the administrative fee receive the benefit of a well-regulated industry and

valuable additional benefits under the City's program that members of
the general public do not receive..………………….                                    40

Conclusion …………………………………………………………                             46

Certificate of Compliance ……………………………………………..               47

Certificate of Service …………………………………………………              47

## <u>Table of Authority and Cases Cited</u>

*Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30 (2005)………                38

*Anderson Nat. Bank v. Luckett*, 321 U.S. 233 (1944)……………..                25

*Block v. Hirsh*, 256 U.S. 135 (1921)…………………………                33

*Bloom v. City of Worcester*, 363 Mass. 136 (1973)…………………7, 8, 9, 15, 20

*East N.Y. Sav. Bank v. Hahn*, 326 U.S. 230 (1945)……………                28, 34

*Emerson College v. City of Boston,* 391 Mass. 415 (1984)…….                41, 42

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.,*
459 U.S. 400 (1983)…………………………………                28, 29, 30, 33, 38

*Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934)     28, 33, 34, 38

*Hudson Water Co. v. McCarter*, 209 U.S. 349 (1908)………                28

*Local Div. 589, Amalgamated Transit Union v. Massachusetts*,
666 F.2d 618, (1st Cir.1981)………………………………                27

*Mercado-Boneta v. Administracion del Fondo de*
*Compensacion al Paciente*, 125 F.3d 9 (1st Cir. 1997)…….     ….                27

*National Cable Television Ass'n v. United States,*
*415 U.S. 336 (1974)*..……………… …………………….                41

*Opinion of the Justices*, 250 Mass. 591 (1925)……………                41

*Parella v. Ret. Bd. of R.I. Emps' Ret. Sys.*,
173 F.3d 46 (1st Cir. 1999)………………………….     ….                27, 28

*Ross v City of Berkley*, 655 F. Supp. 820 (N.D. Cal. 1987)……….………                35

*Silva v. City of Attleboro,* 454 Mass. 165 (2009)……………………                41, 42, 45

*Southview Cooperative Housing Corporation v. Rent Control Board of Cambridge*, 396 Mass. 395 (1985)…………………………………………     45

*St. George Greek Orthodox Cathedral of W. Mass., Inc. v. Fire Dep't of Springfield*, 462 Mass. 120 (2012)……………………     20, 21, 22

*Take Five Vending, Ltd. v. Provincetown*, 415 Mass. 741 (1993)….........     9

*Tri-Nel Mgt., Inc . v. Board of Health of Barnstable*, 433 Mass. 217……     9

*Taygeta Corp. v. Varian Assocs.*, 436 Mass. 217 (2002)……………..     16

*United Auto., Aero., Agric. Impl. Workers of Am. Int'l Union v. Fortuno*, 633 F.3d 37 (1st Cir. 2011)…………………………     27, 28

*United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977)….     29, 33, 34

*Veix v. Sixth Ward Building & Loan Ass'n of Newark*, 310 U.S. 32 (1940)…     29

*Wendell v. Attorney General*, 394 Mass. 518 (1985)………………     7

*Wilber Nat. Bank of Oneonta, N.Y. v. U.S.*, 294 U.S. 120 (1935)……..     25

*Easthampton Sav' Bank v. Springfield*, 874 F.Supp.2d 25, (2012)………………………………     …….1, 9, 14, 20, 23, 26, 31, 32, 37, 38, 40, 46

## <u>Statutory Provisions</u>

The Home Ownership and Equity Protection Act, 15 U.S.C. § 1639………     31

Mass. Gen. Law c. 21E……………………………………………     9, 15, 16, 17, 18, 19, 21

Mass. Gen. Law c. 43B, § 13…………………………………………     7

Mass. Gen. Law c. 111 § 127A……………………………     9, 15, 21

Mass. Gen. Law c. 111, § 127I…………………………………….     11

Mass. Gen Law c. 183, § 27…………………………………………………    31

Mass. Gen. Law c. 186………………………………………………….…    31

Mass. Gen. Law c. 244, § 17B………………………………………….……    31

Mass. Gen. Law c. 244 §35A…………………………………..………    32

Mass. Gen. Law c. 244 § 1 …………………………………………….…    30

## Local Ordinances

Springfield, Mass., Rev. Ordinances § 7.050.010……………..…...    10

Springfield, Mass., Rev. Ordinances § 7.060.070……………...    15, 32

Springfield, Mass., Rev. Ordinances § 7.060.010………………….…    38

Springfield, Mass., Rev. Ordinances § 7.060.030………………………    32

Springfield, Mass., Rev. Ordinances §7.050.030……    15, 16, 18, 19, 23, 26, 40

## Code of Massachusetts Regulations

105 CMR 410.020……………………………………………………    39

## STATEMENT OF THE CASE

On December 8, 2011, the Plaintiffs, consisting of six local lenders, Easthampton Savings Bank, Chicopee Savings Bank, Hampden Bank, united Bank, Monson Savings Bank, Country Bank for Savings ("the Lenders") filed a Complaint for Declaratory Judgment and Equitable Relief against the Defendant, City of Springfield ("the City") in Hampden County Superior Court seeking declaratory judgment that two recently enacted and amended ordinances concerning residential mortgage foreclosure mediation and vacant and foreclosing property registration and maintenance, were preempted by existing state foreclosure laws, and violated the Contracts and Due Process Clauses of the United States Constitution.[1]

The City removed the case to the United States District Court, District of Massachusetts. On May 30, 2012, the Lenders filed a Motion for Judgment with a memorandum in support thereof. On June 6, 2012, the City filed a Reply in Opposition to the Lender's Motion for Judgment, and a Cross Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.

On July 3, 2012, the District Court issued its Memorandum and Order Regarding Plaintiffs' Motion for Judgment as a Matter of Law and the City's Cross

---

[1] The Lenders maintain that an illegal tax claim was asserted within the pleadings in this matter; however, the record shows that the Lenders never included this claim within the Complaint filed with the court. An illegal tax challenge is seen for the first time in the Lenders motion for judgment filed with the District Court.

1

Motion to Dismiss or, in the Alternative, for Summary Judgment. The District Court found that no cause existed for invalidation of the Ordinances, and allowed the City's Cross Motion, dismissing the action. Judgment entered in the City's favor on July 3, 2012. On July 20, 2012, the Lenders filed a Notice of Appeal.

## STATEMENT OF FACTS

The City promulgated municipal ordinances, the subject matter of which are the maintenance of vacant and/or "foreclosing" residential properties, Chapter 7.50 ("Foreclosure Ordinance") *Add* at 23, and the mediation of mortgage foreclosures of owner occupied residential property, Chapter 7.60 ("Mediation Ordinance") *Add* at 29, (known collectively herein as "the Ordinance" or "the Ordinances"). By the terms of the Ordinances, the effective date was stated as September 13, 2011 and they apply to any residential mortgages which existed as of that date. On or about November 21, 2011, the Springfield City Council amended the Ordinances, to be effective on December 13, 2011.

The City is currently in the process of developing procedures to implement the Ordinances. (See Affidavits of the City's Code Enforcement Commissioner, Steven Desilets and the City's Director of Housing, Geraldine McCafferty, submitted to the District Court and with this brief in the City's Addendum, pg. 1 and pg. 4 respectively). The City does not currently have an enforcement

2

mechanism in place. An orderly implementation is scheduled to move forward with the appropriation of adequate funds.

The factual basis for adoption of the Ordinances, as found in the affidavits submitted with this memorandum, is the background of the foreclosure crisis which has plagued our country's economy, and has been particularly devastating on poverty stricken cities, of which Springfield provides an example.

The foreclosure crisis has had negative consequences in the City of Springfield, not only for those who have lost their homes, but also for the entire community, which is consistent with reports from studies from such authorities as the Brookings Institute.[2] Children of homeowners as well as children of renters, who were evicted due to a foreclosure, suffer adverse effects as to their health of children in cash strapped families who do not receive proper nutrition or negative impacts as to their education due to missing school, and increasing the chance of dropping out.

The displacement of families has led to increased vacancies. As properties go vacant, property values have decreased. As values decrease, equity is lost affecting retirement, education and other financial decisions, including the decision of whether to repair or abandon blighted properties. Ultimately, mortgages become "up-side down" and more foreclosures occur.

---

[2] See Affidavit of Geraldine McCafferty  and copy of attached report (Appellee Add. pg. 4)

As properties become vacant, more shattered windows and criminal activity is attracted, leading to a further decrease in values, and making it harder to rent or sell a residential property, requiring them to make tough decisions about retirement or funding a child's college education. According to research on the relationship between foreclosures and crime, when the foreclosure rate increases one percentage point (0.01), the number of violent crime is expected to increase by 2.33 percent. *See affidavit of Gerry McCafferty*, (Appellee Add. at 4).

According to reports produced by the Massachusetts Housing Partnership ("MHP"), Springfield ranked third in the Commonwealth for numbers of distressed properties (defined as 1-3 family properties where a foreclosure petition has been filed). Despite a documented overall decrease in the number of distressed units in Massachusetts over the last year, Springfield jumped up three spots in the rankings, and includes more than 700 distressed single-family properties alone. Additionally, more than half of all properties in foreclosure in Massachusetts are becoming bank owned. This data illustrates that the City  is experiencing more difficulty than other communities in recovering from the foreclosure crisis, as it was hit harder than almost any other community in the Commonwealth. *See affidavit of Gerry McCafferty.*,(Appellee Add. at 4.)

The City's Code Enforcement Commissioner has utilized his staff and resources and worked to enforce the zoning, building, and state sanitary codes in

an effort to prevent the negative effects of blight related to the foreclosure crisis. However, the City has limited resources to allocate to these enforcement efforts, as Springfield was hit with the foreclosure crisis just as the City government was emerging from a financial crisis as declared by the state legislature which led to the legislature's imposition of a Financial Control Board from July, 2004 until July 2009. *See Chapter 169 of the Acts of 2004.*

The Foreclosure Ordinances, once implemented, will utilize mediation to help prevent some foreclosure and provide funds to help the City meet the costs associated with the blight caused by this crisis.  As noted in the Affidavit of Steven Desilets, the City is involved with extensive prosecution of blight cases involving vacant or abandoned properties in foreclosure. The Ordinance is designed to work in conjunction with these enforcement proceedings, and all state laws, rules and regulations.

## SUMMARY OF THE ARGUMENT

A. The Ordinances are not preempted by any Massachusetts Laws, as no express prohibition against such local legislative action is contained within any state laws or regulations, and the Ordinances are not in sharp conflict with and do not frustrate the legislative purpose of any state statutes. The Ordinances are consistent and work in cooperation with existing state laws, containing specific provisions to ensure that no conflicts or inconsistencies

with established laws or regulations are present. As such, a challenge to the validity of the Ordinances on preemption grounds is without merit.

B. The Ordinances do not violate the Contracts Clause of the U.S. Constitution, as they do not significantly impair mortgage obligations and further a significant and legitimate public government purpose. The Ordinances are reasonably tailored to meet the long recognized important government interest of protecting the health and safety of the community, a basic societal interest.

C. The Foreclosure Ordinance Bond requirement does not amount to an illegal tax, as it is a deposit, returned to the registrant upon completion of the foreclosing entity's involvement at the property. A very small percentage of the Bond amount is kept by the City as an administrative fee to offset the costs associated with the maintenance and registration program under the Foreclosure Ordinance. Mortgagees submitting Bond deposits and paying the administrative fee receive the benefit of a well-regulated industry and valuable additional benefits under the City's program that members of the general public do not receive. Because the portion of the Bond payment that is retained is reasonably designed to compensate the City for anticipated

regulation related costs, the charge is classified as a regulatory fee, and cannot be said to amount to an illegal tax.

## ARGUMENT

### I. The Ordinances are not Preempted by Massachusetts Law

In Massachusetts, local governments have Home Rule powers through the Home Rule Procedures Act (Mass. Gen. Law c. 43B, § 13) and constitutional amendments to found in sections 6 and 8, of Article 89 of the Massachusetts Declaration of Rights. "[A] city or town may adopt local ordinances or by-laws to exercise 'any power or function which the general court has power to confer upon it, which is not inconsistent with the constitution or laws enacted by the general court in conformity with powers reserved to the general court…'" *Wendell v. Attorney General*, 394 Mass. 518, 523 (1985) (quoting Mass. Const. Art. Amend. 2, 6, as amended by Art. 89, and G.L. c. 43B, 13). The Massachusetts Supreme Judicial Court has determined that the term "inconsistent" in this context means that a sharp conflict exists between the local and state law, such that enactment of the local law will frustrate the legislative purpose of the state law. *Bloom v. City of Worcester*, 363 Mass. 136 (1973).

The standard for evaluating a preemption challenge concerning local and state laws is derived directly from the test used by the United States Supreme Court to determine whether state laws are preempted by Federal law. "Cases

7

involving the question whether State legislation on a particular subject is forbidden because Congress has preempted the field suggest a reasonable standard to be applied in determining whether a power or function exercised by a locality is inconsistent with any of our General Laws." *Id.* at 152. Essentially, municipalities may enact ordinances, so long as the local laws do not concern subject matter expressly reserved to the state, and if not expressly reserved, so long as the ordinances are not in sharp conflict with an existing state law.

The Supreme Judicial Court has held that the mere fact that a state has passed a law on a particular subject does not act as an automatic prohibition against local action. "The existence of legislation on a subject, however, is not necessarily a bar to the enactment of local ordinances and by-laws exercising powers or functions with respect to the same subject."*Id.* at 157. In the absence of express language forbidding cities or towns from legislating in the same field, it is the comprehensiveness of the state legislation ***and*** whether the local law acts to frustrate the purpose of the state law, which control whether it can properly be implied that the state legislature intended to prohibit local enactments. "If the State legislative purpose can be achieved in the face of a local ordinance or by-law on the same subject, the local ordinance or by-law is not inconsistent with the State legislation, unless the Legislature has expressly forbidden the adoption of local ordinances and by-laws on that subject." *Id.*.

Consistent with this approach, the Courts have given great deference to the legality of local laws within the Commonwealth. "In determining whether a local ordinance or by-law is inconsistent with a State statute, we have given municipalities 'considerable latitude,' requiring a 'sharp conflict' between the ordinance or by-law and the statute before invalidating the local law." *Take Five Vending, Ltd. v. Provincetown*, 415 Mass. 741, 744 (1993), quoting *Bloom*, 363 Mass. at 154. See *Tri-Nel Mgt., Inc . v. Board of Health of Barnstable*, 433 Mass. 217, 223(2001). (applying same reasoning to board of health regulation).

The Appellants ("Lenders"), joined in an *amicus curie* brief submitted by the Massachusetts Bankers Association Inc. ("MBA" or "amicus"), cite to four Massachusetts statutes, M.G.L. c. 244 (Add. at 36) , M.G.L. c. 21E (Add. at 44), M.G.L. c. 266 section 120, and M.G.L. c. 111 section 127A (Add. at 63) and its codification in 105 CMR 400 (the State Sanitary Code) (Add. at 69, 74, and 76) as grounds for the alleged conflict. As the District Court states in its Memorandum and Order on this matter, "[a]n examination of the ordinances reveals no conflict, let alone a 'sharp' one. While the state has established rules and regulations for foreclosures, neither ordinance significantly alters the foreclosure process or the general relationship between mortgagee and mortgagor." *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25, 7-8 (2012) (Add. at 8-9). The District Court's same reasoning can be applied towards the Ordinances in relation

to the Massachusetts Oil and Hazardous Material Release Prevention Act, the State Sanitary Code and Massachusetts Trespass Law.

The absence of a sharp conflict between the Ordinances and the cited statutes can initially be seen through their vastly different purposes and subject matters. The City's impetus for creating the Ordnances was that "unsecured and un-maintained vacant properties and foreclosing properties present a danger to the safety and welfare of public safety officers, the public, occupants, abutters and neighborhoods, and as such, constitute a public nuisance" and the stated purpose of its enactment is "to promote the health, safety and welfare of the public, to protect and preserve the quiet enjoyment of occupants, abutters and neighborhoods, and to minimize hazards to public safety personnel inspecting or entering such properties." (Foreclosure Ordinance, 7.050.010, Appellant's Add. at 23).

As noted in the Affidavit of Steven Desilets, the City is extensively involved in the prosecution of blight cases, State Sanitary Code violations and Receiverships in Housing Court. Many of these matters involve vacant or abandoned properties in foreclosure. Since January 1, 2011, the City of Springfield has been required to undertake emergency measures to board and secure premises that are vacant, unsecured, and attracting squatters or other illegal activity. (Appellee's Add. at 1).

Between January 1, 2011, and May 1, 2012 City Code Enforcement Officials have issued 468 citations for violations of the City's anti-blight

10

Ordinance. Those citations resulted in 54 civil actions filed in Housing Court. Currently, approximately 1200 different properties are pending as open matters referred for Housing Court prosecution. The City has filed 154 requests for Receivership between  January 1, 2009 and May 1, 2012. A total of 65 of those matters have resulted in the appointment of receivers. Between the June 1, 2011 tornado, and May1, 2012 the City condemned over 350 buildings as unfit for human habitation, secondary to the tornado devastation.

The City has always recognized that foreclosure is an option of last resort for lenders, and that mortgage lending institutions are often engaged in activities that seek to preserve property in jeopardy. For example, where a Receivership is contemplated for a property, lenders are put on notice, and commonly elect to step in to protect their interests where there is equity and economic incentive to do so, despite the lack of title and concerns about trespass. Similarly, a lienholder may commonly step in where a Condemnation notice is issued (commonly a violation of mortgage covenants) to protect its interest, as the City seeks to demolish buildings which have not been brought up to Code within one year of the date of condemnation. See Mass. Gen. Law c. 111, § 127I. The Springfield Ordinances are designed to work in conjunction with these enforcement proceedings by providing for mediation where litigation can be avoided and financial resources where litigation is required.

Enforcement actions require extensive resources. For example, the Code Enforcement Commissioner utilizes the services of three full time lawyers, a full time legal assistant, three part time law clerks, as well as up to five volunteer law clerks, in order to process the caseload. The Code Enforcement Commissioner utilizes six full time Housing Inspectors for State and Local Sanitary Code violations, as well as three Zoning Officers whose duties include enforcement of the Anti-Blight Ordinance. Eleven Building Inspectors, whose duties include issuance and enforcement of condemnation orders, work under the supervision of the Code Enforcement Commissioner. (Appellee's Add at 3).

With regard to the impact of the foreclosure process, as noted in the Affidavit of Geraldine McCafferty, Director of Housing for the City, the foreclosure crisis has had negative consequences in the City of Springfield, not only for those who have lost their homes, but also for the entire community, which is consistent with reports from experts[3]. (Appellee's Add. at 7). Children of homeowners as well as children of renters, who were evicted due to a foreclosure, suffer adverse effects as to their health of children in cash-strapped families who do not receive proper nutrition or negative impacts as to their education due to missing school, and increasing the chance of dropping out.

---

[3] *The Ongoing Impact of Foreclosures on Children*, Julia B. Isaacs, Child and Family Policy Fellow, Economic Studies, Brookings Institute (April 2012) (Copy attached to Affidavit of McCafferty provided in Appellee's Addendum).

The displacement of families has led to increased vacancies. As properties go vacant, property values have decreased. As values decrease, equity is lost affecting retirement, education and other financial decisions, including the decision of whether to repair or abandon blighted properties. Ultimately, mortgages become "up-side down" and more foreclosures occur. As properties become vacant, more shattered windows and criminal activity is attracted, affecting public safety throughout the City. For example, we have obtained reports of copper and fixtures being stolen from vacant properties. Squatters have made use of properties despite the lack of any utilities, increasing the potential for fires. We have also had reports of drug activity taking place in vacant houses.

These activities have led to a further decrease in property values, making it harder to rent or sell a residential property, interfering with owners' ability to save for retirement or fund a child's college education. The City has limited resources to allocate to the effort to combat this blight. The Foreclosure Ordinances, once implemented, will utilize mediation to help prevent some foreclosure and provide funds to help the City meet the costs associated with the blight caused by this crisis.

Contrary to the claims of the Lenders and the amicus that the Ordinances conflict with state law or impair mortgage contracts, the net effect will be to preserve the value of the asset that underlies the debt. The City has limited

13

resources to allocate to these enforcement efforts, and will need to expand its resources in order to implement the Ordinances to take advantage of its benefits.

Unlike the Springfield Ordinances, Massachusetts General Laws Chapter 244 was enacted for the purpose of providing regulations for the mortgage foreclosure and redemption process. As set forth above, the Ordinances do not create regulations or legislate on the subject of a Mortgagee's action to foreclose under Chapter 244, nor do they seek to regulate the foreclosure process in any way. The District Court noted, "While the state has established rules and regulations for foreclosures, neither ordinance significantly alters the foreclosure process or the general relationship between mortgagee and mortgagor." *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25, 7-8 (2012) (Add. at 8-9).

The Court further stated that the alleged conflicts presented by the Lenders/Plaintiffs fell short of the necessary sharp conflict required to support invalidation. "The Mediation Ordinance, for example, does not prohibit mortgagees from completing foreclosure proceedings as outlined by the state statute, but merely requires mortgagees to attempt mediation as a preliminary step. Plaintiffs suggested during the hearing on these motions that the Mediation Ordinance may extend the time line set forth for the foreclosure process by Chapter 244, but the ordinance specifically states that the mediation 'shall in no way constitute an extension of the foreclosure process, nor an extension of the right to

14

cure period.' (Mediation Ordinance, Chapter 7.60.070). Likewise, the Foreclosure Ordinance imposes relatively modest duties on mortgagees to maintain properties during foreclosure and does not alter the foreclosure process itself." *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25,8 (2012) (Add. at 9).

The Ordinances in question do not frustrate the purpose of the Sanitary Code, as they do not set new minimum standards for human habitation or seek to establish an alternate local public health code. The stated purpose of the Sanitary Code is to "deal with matters affecting the health and well-being of the public in the commonwealth in subjects over which the department takes cognizance and responsibility, including, but not limited to, standards of fitness for human habitation, housing and sanitation standards for farm labor camps, standards for recreational camps for children, standards for swimming pools, bathing beaches, family type camp grounds, and sanitation standards for food service establishments." M.G.L. c. 111 section 127A. Far from conflicting, the Ordinance works in conjunction with the Sanitary Code, specifically incorporating and mandating compliance with 105 CMR 400 in Section 7.50.030A, where applicable.

Similarly, the Ordinances do not frustrate the purpose of Chapter 21E, as they do not create any hazardous material release prevention and response regulations or seek to legislate on such a subject. The Lenders and the *amicus* argue that the Ordinance's requirement that mortgagees or secured lenders remove

15

hazardous material as defined in M.G.L. 21K and M.G.L. 21E directly conflicts and is inconsistent with those state statutes. The facts, however, do not support this contention. The purpose of the Ordinance is in no way analogous to the purpose of Chapter 21E; "to compel the prompt and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties." *Taygeta Corp. v. Varian Assocs.*, 436 Mass. 217, 223 (2002). While there are undoubtedly underlying public safety and welfare concerns with the State Sanitary Code, and Chapters 21E and 244, the purpose and subject matter of each statute, is distinct from one another and from the Ordinance, further demonstrating that no sharp conflict exists.

In its amicus brief, the *amicus* cites Massachusetts Trespass Law as an example of a state conflict with the Ordinances, alleging that Mortgage Lenders will be ordered by the City Building or Fire Commissioners to illegally trespass on properties, and subject them to criminal prosecution. This contention is wholly unsupported by the facts. A cursory examination of the Ordinance reveals that the purposes of the respective pieces of legislation are not similar in nature, and that any alleged conflict where a mortgagee is purely hypothetical. The City cannot order private corporations to break the law and the Ordinances in no way mandate such actions. Under Section 7.50.030, owners are exempt from all requirements of the Foreclosure Ordinance where in violation of Massachusetts Law. As such, the

hypothetical scenario presented by the *amicus* here can be dismissed as a red herring.

The *amicus* has also cited House Bill No.4323, passed by the Massachusetts Legislature in 2012, as grounds for a preemption challenge, stating that the Mediation Ordinance is in direct conflict; however, this claim does not hold water when examined in light of day. House Bill 4323 does not preempt the Springfield Mediation Ordinance because it does not contain any express prohibition on local legislation, and the purposes of the two respective laws do not conflict in any way. Further, the Mediation Ordinance is a legitimate local exercise of power, and only provides an additional opportunity to conduct a good faith mediation for the benefit of all parties. The Mediation Ordinance should be seen as supplemental and complimentary to House Bill No. 4323, and cannot be accurately depicted as in sharp conflict with the State statute.

The Lenders and the *amicus* also point to an alleged conflict in the way the term "Owner" is defined in the Ordinances as compared to the definitions found within Chapters 244, 21E and 111. Contrary to this assertion, the mere existence of an alternate form of definition for a property "Owner" within an Ordinance does not meet the standard to invalidate a local ordinance on preemption grounds. State statutes often define the same term with varying language, and local ordinances and by-laws are no different. Here, the Lenders and *amicus* neglect to account for

17

the fact the Ordinance anticipates some owners will be legally able to perform certain actions where others cannot.

The City recognizes that alternative definitions of the term "Owner" exist within various state, local and federal laws, suggesting that ownership can be defined in a number of ways. The Ordinance addresses this uncertainty by recognizing potential conflicts through language in section 7.50.030 that states "where applicable" or "at the discretion of the [building] Commissioner" or "to the satisfaction of the fire commissioner." Foreclosure Ordinance, Chapter 7.50.030, Add. at 25. For example, if there is hazardous material present or an issue with failing to meet a minimum standard for human habitation at the property and the mortgagee is not considered an owner under chapter 21E or 105 CMR 400, but is an owner under the Foreclosure Ordinance, the Building Commissioner and/or the Fire Commissioner could not order its removal, if not authorized by state law. The Ordinance expressly recognizes the potential for conflict in a complicated field, and further addresses this through language in section 7.50.030, stating that owners shall comply "unless exempt from such actions by Massachusetts General Laws."

In Section 7.50.030(8), the Ordinance calls for owners to maintain the property in accordance with all other relevant state codes and local regulations concerning the maintenance of property, specifically including the State Sanitary Code. The Ordinance takes into account the possibility that it may conflict with

state law regarding this section, in which case it would not apply. Contrary to the assertions of the Lenders and the *amicus*, the removal of hazardous material from the property is not a mandatory requirement for all owners regardless of the surrounding circumstances, as discretion is provided for the Fire Commissioner to account for all circumstances, as articulated in Section 7.50.030(3).

The Foreclosure Ordinance states that owners shall "Remove from the property, to the satisfaction of the Fire Commissioner, hazardous material as that term is defined in Massachusetts General Laws, Chapter 21K, as that statute may be amended from time to time." Foreclosure Ordinance, Chapter 7.50.030(3), Add. at 25. This language provides the Fire Commissioner with discretion when acting in furtherance of the Ordinance, and in no way "mandates" removal of any hazardous substances in violation of the "safe harbor" clause of M.G.L. c. 21E as the Lenders and *amicus* claim.

The definition of owner in the Ordinance would include mortgagees or secured lenders in possession of the property, who are fully subject to the requirements of chapter 21E and the State Sanitary Code, and it also accounts for scenarios where a mortgage lender would not be able to perform such actions under the cited statutes. The Ordinance was designed to work in harmony with state law provisions governing mortgage foreclosures as well as environmental remediation and standards for human habitation. Therefore, the required sharp

conflict between the Ordinance and the state statutes proffered by the Lenders cannot be said to exist.

The District Court addressed the issue of alternate definitions of ownership in its decision, stating, "Because of the different definitions of owner, the Foreclosure Ordinance admittedly imposes maintenance duties upon mortgagees not in possession of the property that are not present under either the hazardous material statute or the sanitary code. However, the imposition of additional duties by the ordinance does not create the degree of 'sharp conflict' -- or indeed any conflict -- between state and local law that is required to justify invalidation of a municipal ordinance." *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25, 10 (2012) (Add. at 10)

In light of the lack of any express conflict, a reviewing court must look at whether a statute is so comprehensive that the Ordinances act to frustrate the purpose of the state law. *Bloom*, 363 Mass. at 157. The Lenders and the *amicus* misapply the Court's ruling in *St. George Greek Orthodox Cathedral of W. Mass., Inc. v. Fire Dep't of Springfield*, 462 Mass. 120 (2012), and incorrectly equate the Ordinances in question here with the offending Ordinance in that case. In *St. George*, the Court found that the Springfield Financial Control Board approved and enacted an Ordinance mandating the use of one type of fire monitoring system, in direct contradiction of the State Building Code, which allowed for property

owners to choose one of four options for fire monitoring systems. This amounted to the enactment of a local building code that took the place of the existing state code, frustrating one of the stated purposes of the underlying statue, uniformity for building construction activities throughout the Commonwealth. The same cannot be said for the Springfield Ordinances, as they do not frustrate the purpose of any of the statutes cited in the Lenders' or the *amicus* brief.

Unlike in *St. George*, the City here did not enact a local code directly usurping a comprehensive state code. The Ordinances in question in the present matter do not restrict the uniform requirements of any State Code by mandating the use of one specific product, as was the case in *St. George*. Quite the opposite, the Ordinances expressly incorporate all applicable, relevant State Codes, and do not include any narrowing of standards thereunder or competition of purpose.

The Lenders and *amicus* contend that the sheer comprehensiveness of Chapters 244, 21E and 111 section 127A are equal to that of the State Building Code at issue in *St. George*. The Massachusetts State Building Code completely and wholly regulates all building construction, use, and occupancy activities within the Commonwealth, incorporating and having jurisdiction to enforce a myriad of specialty codes, including the State Electrical, Plumbing and Fire Codes as well as the State Sanitary Code. By contrast, Massachusetts has approximately twenty (20) different statutes governing lending and foreclosures, and includes sixteen (16)

different statutes that address environmental management and hazardous waste or materials. The State Sanitary Code is a specialized code that is one of hundreds of sections of the Public Health statute, Chapter 111, and is incorporated into the State Building Code. Although comprehensive, none of cited statutes fully occupies the respective field in which the state has legislated, and cannot be said to rise to the level of sheer comprehensiveness found in the Building Code.

The Lenders and *amicus* misapply the Court's decision in *St. George* in an attempt to create a false standard for preemption evaluations, essentially stating that in the absence of express prohibition on local legislation, the only factor required for determination in a preemption challenge is the comprehensiveness of the allegedly affected state statute. This reasoning must fail as it circumvents the necessary threshold step of comparing and contrasting the legislative purposes of the state and local laws.

The question that must be asked of all local ordinances that address a subject previously addressed by the Massachusetts Legislature, then, is whether the state's legislative purpose can be achieved in the face of a local ordinance or by-law on the same subject. If so, the local ordinance or by-law is not inconsistent with the State legislation, unless the Legislature has expressly forbidden the adoption of local ordinances and by-laws on that subject. The state's legislative purposes in the statutes cited by the Lenders and the *amicus* are in no way frustrated by the

Springfield Ordinances, nor do said statutes expressly prohibit additional local ordinances relative to properties in foreclosure under Massachusetts state law, where the local government undertakes reasonable efforts to address the problem.

Where the state law's legislative purpose can be accomplished in presence of the local law, no conflict can be said to exist. The District Court stated in its decision that the Lenders, "…can simultaneously comply with all the requirements of the state laws and the Foreclosure Ordinance without conflict. If any conflict did arise, the ordinance expressly states that an owner need not comply with its requirements if that owner is 'exempt from such actions by Massachusetts General Laws…'" *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25, 10 (2012) (Add. at 10), citing Foreclosure Ordinance, Chapter 7.50.030.

The Massachusetts Legislature has altered foreclosure procedures and rules as circumstances have changed, as noted in both the Lenders' and the *amicus* briefs. The *amicus* brief  touts the considerable amount of time and effort spent by the State Legislature in carefully crafting recent changes to the mortgage lending industry, and points to this as evidence that the state has appropriate protections in place, intended to fully occupy the field, and that such deliberate efforts should not be disturbed by localities. Unfortunately, this argument fails to recognize a simple, common sense fact that reveals itself when examining the legislative record. After all the time and effort and careful consideration by the legislature, within the

23

resulting volumes of statutory text produced, not a single word on the subject of preempting local action can be found anywhere. Despite the ample amount of time and opportunity to weigh in on or speak as to the issue of local preemption, none of the recent legislative advances cited by the Lenders and *amicus*, actually includes any express or implied language forbidding any local legislation on the subject.

As the *amicus* acknowledges in its brief, the Mortgage Lending and Foreclosure industry has been subject to historical regulation from various governmental entities for many years, and additional regulations and changes are potentially forthcoming. In Massachusetts, recent changes to General Laws Chapter 244, and continuing legislative action in the field of mortgage lending, shows the capacity of foreclosure regulations and statutes to be adjusted to the changing world. The fact that revisions have historically continued to unfold over time establishes that firms engaged in the industry should at all times be aware of changes in regulations occurring in the future, and that a duty exists for firms to keep up to date with the laws of all the jurisdictions in which business is conducted.

The Lenders and the *amicus* appear to argue that they have no responsibility to know the law, and that the City of Springfield has an obligation to provide the Plaintiffs with an education on Massachusetts General Laws. Such an argument must fail, as the Court has been clear in stating that all people under the law,

24

including corporations who make a profit by loaning money through mortgage agreements, have an ongoing obligation to be familiar with the laws that govern the jurisdiction and the arena of business in which they have elected to operate. See *Wilber Nat. Bank of Oneonta, N.Y. v. U.S.*, 294 U.S. 120, 124 (1935) (Court assumed that statutes and regulations governing War Risk Insurance Bureau are known by those who deal with it); see also *Anderson Nat. Bank v. Luckett*, 321 U.S. 233, 243 (1944) (All persons having property located within a state and subject to its dominion must take notice of its statutes affecting control or disposition of such property and of the procedure which they set up for those purposes).

The Ordinances acknowledge that different circumstances exist as to each property, and as such, the requirements for compliance with the Ordinances largely rest on case-by-case determinations from the Building and Fire Commissioners. As stated above, the Ordinances also include a clause specifically for circumstances where actions may be exempted by Massachusetts General Laws. The Lenders and *amicus* allege that the inclusion of the clause "unless exempt from such actions by Massachusetts General Laws" within the subject Ordinances somehow shows a sharp conflict with existing state laws by contending that owners under the subject Ordinances are somehow now faced with an onerous and unrealistic burden to be

familiar with state law because the City has included a clause within the Ordinances that provides guidance where any potential conflicts may arise.

The Lenders and *amicus* allege that they are in an untenable situation in trying to determine how and whether to comply with the Foreclosure Ordinances; however, the plain language of Chapter 7.50.030, which sets forth owners' requirements under the maintenance and registration portion of the Foreclosure Ordinances, contains provisions that it is the Building and Fire Commissioners who must make determinations about the applicability of the Ordinances to a property, not property owners. When a property becomes eligible for registration under the Ordinances, compliance with the Ordinances is simply a matter of following the Regulations (which will be forthcoming when implementation begins and will be available to all members of the public) and the orders of the Building and Fire Commissioners respectively (which are made on a case-by-case basis). As such, to suggest that mortgage lenders have the obligation to make determinations about how and whether to comply with the Ordinances is simply incorrect.

On the issue of preemption, the District Court states in summation, "…the court finds that there is simply no conflict between the two ordinances and any Massachusetts state law that would support the conclusion that the ordinances are preempted" *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25, 11 (2012) (Add. at 11).

## II. The Ordinances do not violate the Contract Clause of the U.S. Constitution

Article I, §10 of the U.S. Constitution provides that "no State shall…pass any law…impairing the Obligation of Contracts." U.S. Const. Art. I § 10 cl. 1. **However, a**s noted in a recent case, *United Auto., Aero., Agric. Impl. Workers of Am. Int'l Union v. Fortuno*, 633 F.3d 37, 41 (1st Cir. 2011), despite its unequivocal language, the constitutional provision concerning impairment of contracts "does not make unlawful every state law that conflicts with any contract . . . ." *Local Div. 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 638 (1st Cir. 1981) and the Ordinances at issue here are not unconstitutional and do not provide a sufficient basis for a claim pursuant to § 1983.

Under the Contracts Clause, "[a] court's task is 'to reconcile the strictures of the Contract Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens.'" *Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente*, 125 F.3d 9, 14 (1st Cir. 1997) (internal citations omitted). To that end, Contract Clause claims are analyzed under a two-pronged test[4]. *Parella v. Ret. Bd. of R.I. Emps' Ret. Sys.*, 173

---

[4] This two-pronged test is often framed as a three-part analysis: "(1) whether the contractual impairment is in fact substantial; if so, (2) whether the law serves a significant public purpose, . . . (3) whether the means chosen to accomplish this purpose are reasonable and appropriate." *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 52 (2d Cir. 1998) (internal quotation marks and citation omitted); see also *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 191

F.3d 46, 59 (1st Cir. 1999). The first prong "is 'whether the state law has . . . operated as a substantial impairment of a contractual relationship.' " *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). If the contract is substantially impaired, the court next turns to the second prong and asks whether the impairment was "reasonable and necessary to serve an important government purpose." See *Parella*, 173 F.3d at 59. A state may enact valid measures that effect existing contracts in order to preserve the order, health, safety, morals, and economic well-being of the community, so long as it passes the Court's constitutional test. "The economic interests of the state may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts." *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 443-44 (1934); *see also Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411 (1983); *East N.Y. Sav. Bank v. Hahn*, 326 U.S. 230, 232 (1945); *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908). State or local legislation must simply be "addressed to a legitimate end and the measures taken [must be] reasonable and appropriate to that end." *Blaisdell*, 290 U.S. at 438-39.

---

(1st Cir. 1999) (dividing the second inquiry into two subparts: whether there is a legitimate public purpose for the state action and whether the adjustment of contractual obligations is reasonable and necessary to accomplishing that purpose). The First Circuit in *United Auto* found "no substantive difference between these differing characterizations of the Contract Clause analysis". *United Auto* at 10.

In the present case: 1.) there is in fact no substantial impairment of the creditor's contractual rights; 2.) there is a significant and legitimate public purpose behind the regulation; 3.) and the altering of the rights and responsibilities of the contracting parties at issue here is based on reasonable conditions and of a character appropriate to the public purpose supporting the legislation. *Energy Reserves Group v. Kan. Power & Light Co.*, 459 U.S. 400 (1983).

>    a.    *The Ordinances Do Not Substantially Impair Mortgagees' Contracts.*

Where a state or municipality has passed a law that alters or modifies the obligations within an existing contract, a substantial impairment must be shown to maintain a constitutional challenge on Contract Clause grounds. *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 42 (2005). A state may limit a contracting party to "gains it reasonably expected from [its] contract." *Id.* (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 26-27 (1977). Reasonable expectations must be constructed in light of the entire regulatory scheme that governs a given contract. It is not reasonable to assume that a regulated industry will never experience changes in regulation. See *Veix v. Sixth Ward Building & Loan Ass'n of Newark*, 310 U.S. 32, 38 (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation on the same topic"). The ordinances at issue in this case, are reasonable regulations within the entire regulatory scheme for mortgages in Massachusetts.

In *Energy Reserves Group*, the Supreme Court considered Kansas's decision to impose price controls on natural gas. 459 U.S. at 407-09. No party questioned that this regulatory change would cost Energy Reserves Group ("ERG") significant revenue. In fact, the Court found that ERG drafted its contracts with Kansas's public utility presuming it would be able to implement certain price increases, and that the Kansas price controls made those price increases impossible. *Id*. at 415. In other words, the Kansas price control law significantly cut into the revenues ERG had, with good reason, expected to earn under its contract. Yet, the Supreme Court held that Kansas had not substantially impaired ERG's contract. ERG, according to the Court, should have been aware that it was operating in a heavily regulated industry. *Id*. While the Kansas legislature had never before regulated the intrastate price of natural gas, the state had regulated other aspects of the industry, and the federal government's control of interstate gas rates had effectively limited intrastate rates. *Id*. at 413-14.

In this case, Mortgagees are operating in industry that has a history of evolving regulations.  Mortgagees should expect that regulations will change from time to time, in order to protect the public. Massachusetts has regulated foreclosure procedures for generations. *See* st.1785 c. 22 § 2 (1785), codified at G.L. c. 244 § 1 (regulating process for foreclosure).  The Lenders and the *amicus* acknowledge this point in their respective briefs. In Massachusetts, mortgagees should expect that

the state and its subdivisions will adjust mortgage regulations. Massachusetts law requires notice to the mortgagor prior to pursuing a deficiency action. See Mass. Gen. Law c. 244, § 17B. Massachusetts statutes also require a post-**foreclosure** notice of accounting. See Mass. Gen Law c. 183, § 27. In addition, there are Massachusetts and federal statutes regulating eviction of post-foreclosure tenants. See Mass. Gen. Law c. 186 and Protecting Tenants at Foreclosure Act, Pub L. 111-22 (2009) ; the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639 (establishing foreclosure requirements and prohibiting abusive practices related to high cost mortgages).

Both the Lenders and the *amicus* attempt to draw a meaningful distinction between federal/state action and local action, in the context of historical analysis of the mortgage lending industry. This argument is not germane to the present matter, as the District Court noted in its Order, "…that these regulations were issued by a municipality and not by the state does not change the fact that Plaintiffs should have reasonably expected the possibility of changes similar to those contained in the ordinances when entering into the mortgage contracts." *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25, 11 (2012) (Add. at 14).

The Ordinances' effect on the Lenders' contracts are far less severe than the regulations challenged by ERG. In this case, mortgagees do not face any direct financial change. The Ordinances require that mortgagees engage in a dialogue

31

with mortgagors while they wait for the state-mandated foreclosure waiting period to expire. Mediation Ordinance, Chapter 7.60.030, Add. at 29, 31. Mortgagees are not required to *consider* a contractual change that would affect the financial obligations of the contract. They are required to consider only "commercially reasonable" alternatives to foreclosure, with "commercially reasonable alternatives" defined to include those that are reasonable given the mortgagor's ability to pay, the net present value of the property being used as collateral, and the creditor's own interests. Mediation Ordinance, Chapter 7.60.070, Add. at 29 (requiring "good faith effort to negotiate and agree upon a commercially reasonable alternative"). These obligations are consistent with current state laws. See Mass. Gen. Law c. 244 §35A(c) (defining "good faith effort to negotiate and agree upon a commercially reasonable alternative" to require consideration of these three factors).

On the issue of contractual impairment, the District Court found that, "…the impairment at issue in this case is minor and does not affect any of the key aspects of Plaintiffs' contracts with mortgagors, such as the value of the property underlying the mortgage or Plaintiffs' ability to foreclosure on the property…this burden does not rise to the level of a substantial impairment." *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25, 11 (2012) (Add. at 14).

b. *The Ordinances Have A Significant And Legitimate Public Purpose.*

Assuming *arguendo* that Lenders can show a substantial impairment of their contracts, the Ordinances have a "significant and legitimate public purpose." *Energy Reserves Group, Inc.,* 459 U.S. at 411-12 (citing *United States Trust Co.,* 431 U.S. at 22). The public purpose requirement does not demand that every law be necessary or even effective. It simply "guarantees that the State is exercising its police power, rather than providing a benefit to a special interest." *Id.* at 412; *see also Blaisdell*, 290 U.S. at 445. When evaluating whether a substantial impairment is a reasonable exercise that is necessary to accomplish an important government purpose, the following factors may be considered by a court: whether the ordinance (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency. *Fortuno.* 633 F.3d at 41, 46.

The public purposes behind the Ordinances have long been considered sufficient to justify substantial impairment of contracts. The Ordinances have a clear and direct impact on the availability of affordable housing for those facing foreclosure, an interest that the Supreme Court has long acknowledged justifies regulation, *see Block v. Hirsh*, 256 U.S. 135, 156 (1921) (Holmes, J) ("Housing is a necessary of life. All the elements of a public interest justifying some degree of

public control are present."); *Blaisdell*, 290 U.S. at 437; *East N.Y. Sav. Bank v. Hahn*, 326 U.S. 230, 232-33 (1945) (moratorium on foreclosures lasting more than a decade is valid exercise of police power).

The *Blaisdell* Court concluded that there could be no question of the state's power to act "where vital public interests would otherwise suffer." *Id*. at 440. Of course, *Blaisdell* was decided during the Great Depression, a consideration that played a role in the decision. *Id*. at 444-45. But *Blaisdell* cannot be read as a case that applies only in the context of an economic catastrophe of that magnitude. The Court rejected any effort by the challenger to question whether economic conditions in Minnesota matched the conditions found to justify economic intervention elsewhere. *Id*. at 444. It was enough that the state faced an "economic emergency which threatened the loss of homes and lands which furnish those in possession the necessary shelter and means of subsistence." *Id*. at 444 - 45.

The Supreme Court has since clarified that the state may abrogate contractual rights even when no economic catastrophe is present. *United States Trust Co.*, 431 U.S. at 22 n.19 (1977). The Ordinances were drafted in response to a significant economic disruption. The City of Springfield appropriately determined that foreclosures have had a significant and pervasive effect on the health, safety and welfare of the population in Springfield and throughout the country. *See generally* Dan Immergluck & Geoff Smith, *The Impact of Single-*

*family Mortgage Foreclosures on Neighborhood Crime*, 21 Housing Studies 851, 854 (November 2006) (documenting  increase in neighborhood's rate of violent crime associated with increase in foreclosures). As noted by the State Legislature in the enactment of Chapter 169 of the Acts of 2004 (entitled "AN ACT RELATIVE TO THE FINANCIAL STABILITY IN THE CITY OF SPRINGFIELD") "[t]he fiscal crisis [in Springfield] poses an imminent danger to the safety of citizens of the city and their property" and, as supported by the Affidavits submitted here, the fiscal stability of Springfield is being threatened by the foreclosure crisis, despite the efforts of the state's legislature.

The District Court for the Northern District of California invalided an Ordinance which prohibited commercial lessors from terminating leases, siting the impairment of lessors' contractual rights through the destruction of contractual expectations. *Ross v City of Berkley* (655 F. Supp. 820). The facts in this matter are clearly dissimilar and do not support such a finding. The Ordinance in question in *Ross* created a strict prohibition of a contractual right that greatly diminished the value of existing commercial lease contracts by destroying a specific remedy included therein, termination. Such a prohibition was deemed to constitute a substantial impairment of the existing contract.

No actual evidence has been presented by the Lenders showing that the Ordinances cause a <u>severe</u> disruption of contractual obligations. In the present

35

case, Springfield's Foreclosure Ordinances do not prohibit any remedies that are available to mortgagees seeking foreclosure, and in no way detrimentally affect the value of the mortgage contract. The Ordinances in question here act to preserve the value of the underlying asset of the Mortgage agreement, while still allowing the Mortgagee to exercise its right to foreclose.

The Springfield Ordinances apply equally to all residential mortgage agreements. Additionally, the basic terms of mortgage contracts in existence at the time of the enactment of the Ordinances are not altered by Springfield's local law, as the term of the loan, payment schedule, and remedies for breach of the agreement all remain fully intact and unchanged. The Lenders claim that the Ordinances shift the responsibilities for repairing the property from mortgagors to mortgagees, but the only requirement of mortgagees under the Ordinances is to maintain the property in order to preserve the asset; the mortgagee is not required to repair or rehabilitate the property.

Further, as stated above, no affidavits or other evidence are contained in the initial pleadings or motions or memorandums or briefs showing that the Ordinances cause a <u>severe</u> disruption of contractual obligations. Maintenance of the property was already an existing right before the Ordinances as most (if not all) mortgage agreements include such a clause or provision for such action under certain circumstances in order to preserve the property. Where indicia are present

36

to show the mortgagor has exercised rights, in conformance with current law and practice, the City intends to follow through with such Code Enforcement efforts.

The District Court found that the City was able to unmistakably show that the ordinances were a valid exercise of municipal police powers, and that the underlying purpose of the legislation satisfied the second prong of the Court's analysis on a Contracts Clause challenge. "Even if the impairment were substantial, Plaintiffs' Contracts Clause claim would still fail under the second prong of the analysis…In this case, Defendant [City of Springfield] has made a sufficient showing that the Foreclosure Ordinance was necessary to protect a basic societal interest, was tailored appropriately to that purpose, and imposed reasonable conditions." *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25, 11 (2012) (Add. at 14-15). The Court further stated that, "Protecting the health and safety of the community has long been recognized as an important governmental objective that falls squarely within the City's police powers." *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25, 11 (2012) (Add. at 16).

c. *Courts Should Defer to Springfield As To Whether Its Ordinances Are Appropriate To Its Purpose.*

The final Contracts Clause inquiry— (or part of the second prong, depending on the analysis) i.e. whether  "the adjustment of the rights and

responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption"—poses no barrier here. As the District Court states in its Order and Memorandum, "For economic and societal regulation, 'courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'" citing *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22-23 (1977). *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25, 11 (2012) (Add. at 15).

Where the legislative body regulates contracts to which it is not a party, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserve Group*, 459 U.S. at 413; *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 43 (1st Cir. 2005). This is true in the context of mortgages, which are "creatures of equity," historically subject to contractual revisions that serve the ends of fairness and justice. *Blaisdell*, 290 U.S. at 446-47. Springfield has concluded that the Ordinances will reduce unnecessary foreclosures, which pose a threat to the "safety and welfare of public safety officers, the public, occupants, abutters and neighborhoods." Mediation Ordinance, Chapter 7.060.010, Add. at 29.

The Ordinances do not shift any responsibilities in terms of repairing or rehabilitating properties that do not exist currently, but rather call for maintenance

that is in furtherance of the preservation of properties already established by state law and the terms of the mortgage agreement. Such maintenance obligations already exist for mortgagees in Massachusetts. For example, the State Sanitary Code imposes a duty upon entities exercising control over properties which could be a property manager, owner, or mortgagee, depending on the facts. If a mortgagee is collecting rents, changing locks, seeking to evict, or carrying out other activities indicating satisfaction of the State Sanitary Code obligations, the City currently and under the Ordinances, seeks to impose obligations to maintain and repair. 105 CMR 410.020.[5]

However, each case is going to require a case-by-case determination. Where the indicia are insufficient to satisfy the State Sanitary Code, the City would not be able to impose additional duties. It will likely involve the discretion of the Building Commissioner and/or Fire Commissioner as to the factual basis for imposing such duties. What the Ordinance provides is a regulatory database, funding for operations, and an alternative dispute resolution process.

The District Court held that, "…the Foreclosure Ordinance is reasonably tailored to meet [its] objective. It allocates the responsibilities for maintenance of

---

[5] "Owner means every person who alone or severally with others, . . . (2) has care, charge, or control of any dwelling . . . vacant or otherwise . . . in any capacity, including but not limited to agent, executor, executrix, administrator, administratrix, trustee or guardian or the estate of the holder of legal title . . ..(3) mortgagee in possession of any such property. . .."

properties pending foreclosure, helps fund the City's efforts in the foreclosure crisis through the cash bond requirement, and increases the information in the City's regulatory database to make enforcing mortgage regulations more efficient, all while imposing relatively minor burdens on Plaintiffs that do not affect Plaintiffs' ultimate right to foreclose. In sum, the Foreclosure Ordinance falls far short of risking any violation of the Contracts Clause." *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25, 11 (2012) (Add. at 16-17).

## III. The Foreclosure Ordinance Bond Requirement Does not Constitute an Illegal Tax

The Lenders assert that section 7.50.030 (11) of the Foreclosure Ordinances constitutes an unlawful tax under Massachusetts law, a claim that was never plead by the Lenders in the Complaint filed in this matter. The Ordinances set forth a requirement that a $10,000.00 cash bond be paid to the City upon registration of a property under Ordinance 7.50, that $500.00 of that bond be retained by the City as an administrative fee, and in the event of non-compliance, that the City would have the option to draw down upon the bond funds to maintain subject properties. The Bond itself would be returned to the registrant upon transfer of the property, or where the foreclosure process has been completed and the property is occupied.

The fee charge is regulatory in nature, where the City is acting in furtherance of its police powers, rather than proprietary in nature, where such a fee would be

considered a user fee for "initial construction and for adequate maintenance of instrumentalities owned by the government." *Opinion of the Justices*, 250 Mass. 591, 597 (1925).

The standard for evaluation of whether a local regulatory fee amounts to an unlawful tax is set forth in both *Emerson College v. City of Boston,* 391 Mass. 415, 425 (1984), quoting *National Cable Television Ass'n v. United States, 415 U.S. 336, 341 (1974),* and *Silva v. City of Attleboro,* 454 Mass. 165 (2009), and can be summarized as a three factor test: whether the fee "(1) applies to the direct beneficiary of a particular service, (2) is allocated directly to defray the costs of providing the service, and (3) is reasonably proportionate to the benefit received." *Silva v. City of Attleboro,* 454 Mass.at 172 (2009).

Because the fee in question here is a regulatory fee, the Massachusetts Supreme Judicial Court has rejected the element of voluntariness or choice as a factor in determining whether the fee constitutes an unlawful tax. "The question of whether a regulatory charge is voluntarily incurred is of no relevance in determining whether that charge is a fee or tax." *Silva v. City of Attleboro,* 454 Mass 165.

The Ordinances in question satisfy all three prongs of the standard articulated in *Emerson* and *Silva,* as the fee charge does apply to the direct beneficiary of a particular service, is allocated directly to defray the costs of

providing the service, and is reasonably proportionate to the benefit received. Evaluating the Ordinances in light of the standard above, the Lenders assert that such a fee is not paid in exchange for a particular governmental service, which confers a benefit to the party paying the fee in a manner not shared by other members of society, and that this renders the fee an unlawful tax. The Plaintiffs misrepresent the "particular benefit" requirement of the standard, however, and neglect to address the entirety of the *Silva* and *Emerson* decisions relative to this particular factor.

As the Supreme Judicial Court stated in *Silva*, the Lenders here, as mortgage lenders, receive a particularized benefit in the form of a well regulated industry. The Ordinances act to preserve the value of the assets that underlie the Lenders' mortgage contracts, and provide stability across the real estate market in Springfield, further benefiting fee paying entities in the Lenders' alleged shoes. This preservation and stability is a direct benefit to the fee payer, and although the public also receives a benefit (the improvement of problem properties throughout the City), the mere fact that other parties enjoy indirect benefits does not render a fee an unlawful tax.

Additionally, other specific benefits are conferred on fee payers under the registration program that are not enjoyed by members of the general public. The fee paid allows the City to operate and maintain the foreclosure registration

program, which includes a database of registered properties providing ownership information and allows the Code Enforcement Department greatly increased efficiency in dealing with vacant and foreclosed properties. See Affidavit of Steven Desilets.

The fee payer, in return, receives several benefits. Because the City maintains a database of information for registered properties, which includes the fee payer's contact information and phone numbers for persons on the ground, who are in charge of the property, a fee payer receives the benefit of a direct line of communication with the City's Code Enforcement Department where problems are found to exist at a property. Where the City has been made aware of an issue at a registered property, it uses the contact information provided to inform the registered party of the problem on cite, and provides the opportunity for the party to address any issues without the need for a Code Enforcement action to commence.

Such information is not available to the City in the absence of the registration program, and results in the Code Enforcement Department initiating an enforcement action by sending legal notices to the owner of record at the Hampden County Registry of Deeds. In such a scenario, mortgage lenders in foreclosure would not receive any notice (unless the subject property has been condemned) from the City, and in the absence of any outside corrective action, the subject

property would continue to fall into disrepair, losing value with each day. The fee-payer is thus far better able to preserve the value their property thru maintenance and security measures, where it is receiving direct notice from the City that it would otherwise not receive.

Where the City has been made aware of an issue at a registered property, the registration information is used to inform the registered party of the problems on site, and provides an opportunity for the party to address any issues right away, without the need for a Code Enforcement action to commence. Such a benefit has positive financial impacts both on the value of the subject property and relative to the use of both parties' time and personnel resources. This direct benefit is not received by members of the general public, or non-fee-payers.

The Lenders also contend that the payment of the Bond requirement amounts to an unlawful tax, as it is not reasonably proportionate to any service received by secured lenders. This conclusion fails to account for the very nature of a Surety Bond payment, where the funds are deposited, held, and eventually released to the original party holding the monies. Thus, the Bond requirement should not be analyzed under Plaintiffs' unlawful tax claims, as it is not a fee.

This registration system provides the fee payer with direct benefits not received by the general public. However, it requires the use of additional City resources relative to administrative and inspectional services. See Affidavit of

44

Steve Desilets, Appellee Add pg. 1. As such, the fee being paid is allocated to directly offset the costs associated with the program. Far from demonstrating the necessary disconnect between the use of fee monies for the services rendered, the fee is used for supporting the registration and maintenance program included in Ordinance 7.50, and the enforcement efforts associated with said program.

Additionally, the fee charge is reasonably proportionate to the benefit received. The registration system and the employee hours used to maintain and enforce the program costs the City money that it otherwise would not be spending. Although it is the Defendant's position that the amount of the fee charges is reasonable and proportionate with the services provided, it should be noted that Courts in the Commonwealth have generally not been willing to find that a regulatory fee is not commensurate with the cost of providing regulatory services, and have not scrutinized the amount of a fee too closely even if some incidental revenue is obtained. *Southview Cooperative Housing Corporation v. Rent Control Board of Cambridge*, 396 Mass. 395 (1985).

The District Court addressed the Lenders' illegal tax argument in the following manner: "The Plaintiffs' argument is unconvincing. The Massachusetts Supreme Judicial Court has explained that 'the particularized benefit provided in exchange for [regulatory fees] is the existence of the regulatory scheme whose costs the fee serves to defray.' *Silva,* 545 Mass. At 170. The City's retention of a portion of the

45

bond under the Foreclosure Ordinance is directly tied to defraying its costs of regulating foreclosures in the City. Consequently, Plaintiffs do receive a particularized benefit from the cash bond in the form of a well-regulated industry. Because the portion of the bond that the City retains is 'reasonably designed to compensate the [City] for its anticipated regulated-related expenses,' the charge constitutes a regulatory fee, not a tax. Id. At 173" *Easthampton Saving Bank v. City of Springfield*, 874 F.Supp.2d 25, 11 (2012) (Add. at 18-19).

## V. CONCLUSION

For the foregoing reasons, the City respectfully requests that this honorable court upholds and affirms the District Court's Memorandum and Order Regarding Plaintiffs' Motion for Judgment as a Matter of Law and Defendant's Cross Motion to Dismiss, or in the Alternative, for Summary Judgment, and that the Court dismiss the Lenders' appeal.

Respectfully Submitted
Appellee City of Springfield
By its Attorneys

| /s/ Edward M. Pikula | /s/ Anthony I. Wilson | /s/ Thomas D. Moore |
|---|---|---|
| Edward M. Pikula, Esq. | Anthony I. Wilson, Esq. | Thomas Moore |
| BBO # 399770 | BBO # 1157353 | BBO # 1154107 |
| City Solicitor | Associate City Solicitor | Associate City Solicitor |
| City of Springfield | City of Springfield | City of Springfield |
| Law Department | Law Department | Law Department |
| 36 Court Street | 36 Court Street | 36 Court Street |
| Springfield, MA 01103 | Springfield, MA 01103 | Springfield, MA 01103 |
| (413) 787-6085 | (413) 787 – 6085 | (413) 787 – 6085 |

## **CERTIFICATE OF SERVICE**

I, Thomas D. Moore, hereby certify that on July 15, 2013, I electronically filed the Defendants/Appellees' Brief, with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the foregoing document filed through the CM/ECF system will be sent electronically to Plaintiff/Appellant's counsel of record, Tani Sapirstein, of Sapirstein &Sapirstein, P.C., 1350 Main Street, 12th Floor, Springfield, MA 01103, and to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Thomas D. Moore
_____
Thomas D. Moore

## **Certificate of Compliance with Rule 32(a)**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,881 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 and Times Roman 14 type style font.

/s/ Thomas D. Moore
_____
Thomas D. Moore

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

## CASE NO. 12-1917

---

EASTHAMPTON SAVINGS BANK, et al
*PLAINTIFFS-APPELLANTS*
vs.
CITY OF SPRINGFIELD
*DEFENDANT-APPELLEE*

---

ON APPEAL FROM A JUDGMENT OF UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[C.A No.: 11-CV-30280-MAP]

---

## APPELLEE'S ADDENDUM

---

Respectfully submitted,

The Defendant/Appellee
City of Springfield
By its attorneys


/s/ Thomas D. Moore
Thomas Moore,; Bar No: 1154107
Edward Pikula, Esq.; Bar No: 399770
Anthony Wilson, Esq.; Bar No: 1157353
City of Springfield
Law Department
36 Court Street
Springfield, MA  01103
TEL (413) 787-6085
FAX (413) 787-6173

## TABLE OF CONTENTS

Affidavit of Steve Desilets...................................................................1

Affidavit of Geraldine McCafferty...................................................4

# United States District Court
## District of Massachusetts

**CHICOPEE SAVINGS BANK
COUNTRY BANK FOR SAVINGS
EASTHAMPTON SAVINGS BANK
HAMPDEN BANK MONSON SAVINGS
BANK and
UNITED BANK,**

PLAINTIFFS,

v.

**CIVIL ACTION NO.**
11-30280-MAP

**CITY OF SPRINGFIELD,**

DEFENDANT.

---

## AFFIDAVIT OF STEVEN DESILETS

---

**I, Steven Desilets, on oath do say:**

1. I am the Code Enforcement Commissioner for the City of Springfield, with a business address of 70 Tapley Street, Springfield, Massachusetts and I am a the City Official who will be responsible for enforcement of the foreclosure ordinance which is at issue in the above-captioned matter.

2. In the course of my employment I have attended meetings with regard to the issue of implementing the City's Foreclosure Ordinance.

3. By the terms of new Ordinances, the effective date was stated as September 13, 2011 and the Ordinances apply to any residential mortgages which existed as of that date. On or about November 21, 2011, the Springfield City Council amended the Ordinances, to be effective on December 13, 2011.

4. However, the City is currently in the process of developing procedures to implement the Ordinances and the City does not currently have an enforcement mechanism in place, and has stayed enforcement of the subject Ordinances pending the adoption of implementation procedures.

5. Efforts to implement it have included meetings; additionally I compiled data to attempt to determine the cost of implementing the ordinances.

6. In my official capacity I have worked to enforce the zoning, building, and state sanitary codes in an effort to prevent the negative effects of blight related to the foreclosure crisis. The City is extensively involved in the prosecution of blight cases, State Sanitary Code violations and Receiverships in Housing Court. Many of these matters involve vacant or abandoned properties in foreclosure.

7. For example, since January 1, 2011, the City of Springfield has been required to undertake emergency measures to board and secure premises that are vacant, unsecured, and attracting squatters or other illegal activity in 89 properties. During the same time period, the City Code Enforcement Officials has issued 468 citations for violations of the City's anti-blight Ordinance. Those citations resulted in 54 civil actions filed in Housing Court.

8. Currently, approximately 1200 different properties are pending as open matters referred for Housing Court prosecution. The City has filed 154 requests for Receivership since January 1, 2009. A total of 65 of those matters have resulted in the appointment of receivers.

9. When the City declares a property condemned as unfit for human habitation the City has to notify all lienholders under M.G.L. c.111, §127A. Additionally, if the City

moves to have a receiver appointed to take over the property all lienholders must be notified.  When there is equity and economic incentive, lienholders who receive notice will commonly step in to protect their interest, obviating the need to appoint a receiver. Similarly, a lienholder may step in where a condemnation notice is issued (commonly a violation of mortgage covenants) to protect its interest. The City seeks to demolish buildings which have not been brought up to Code within one year of the date of condemnation. See 127I.

10. The City's efforts to respond to the effects of the foreclosure crisis require extensive resources.  The Code Enforcement department has assigned to it the services of three full time lawyers, a full time legal assistant, three part time law clerks as well as up to five volunteer law clerks in order to process the caseload. The Code Enforcement Department currently employs six full time Housing Inspectors for State and Local Sanitary Code violations, as well as three Zoning Officers whose duties include enforcement of the Anti-Blight Ordinance. Eleven Building Inspectors, whose duties include issuance and enforcement of condemnation orders, work under my supervision as well.

11. The City has limited resources to allocate to these enforcement efforts, and needs to expand its resources in order to implement the Ordinances.

12. The Foreclosure Ordinances, once implemented, will utilize mediation to help prevent some foreclosure and provide funds to help the City meet the costs associated with the blight caused by this crisis.

Signed under penalty of perjury this __/__ day of May, 2012

Steven Desilet, Code Enforcement Commissioner

3

# United States District Court
# District of Massachusetts

**CHICOPEE SAVINGS BANK**
**COUNTRY BANK FOR SAVINGS**
**EASTHAMPTON SAVINGS BANK**
**HAMPDEN BANK MONSON SAVINGS**
**BANK and**
**UNITED BANK,**
            PLAINTIFFS,
    v.


**CITY OF SPRINGFIELD,**

        DEFENDANT.

**CIVIL ACTION NO.**
11-30280-MAP

---

### AFFIDAVIT OF GERALDINE MCCAFFERTY

---

**I, Geraldine McCafferty, on oath do say:**

1. I am the Director, Office of Housing at City of Springfield, Massachusetts, with a business address of 1600 E. Columbus Ave., Springfield, Massachusetts and I am a the City Official who will be responsible for enforcement of the foreclosure ordinance which is at issue in the above-captioned matter. I have been the City's Director of Housing since July 2009.

2. My past experience includes Deputy Director, Office of Housing at City of Springfield, (June 2006 to July 2009), Staff Attorney at Western Massachusetts Legal Services, (2001 through 2006) assigned to Housing Issues, Staff Attorney at Colorado Legal Services (1990 through 2001).

3. My educational background includes a Master level degree in Urban and Regional Planning from the University of Colorado at Denver, a Juris Doctorate degree from

Georgetown University Law Center, and a B.A. from the University of Notre Dame. I am a member of the Neighborhood Stabilization Program Professionals.

4. In the course of my employment I have attended regular meetings with regard to the issue of implementing the City's Foreclosure Ordinance.

5. By the terms of new Ordinances, the effective date was stated as September 13, 2011 and the Ordinances apply to any residential mortgages which existed as of that date. On or about November 21, 2011, the Springfield City Council amended the Ordinances, to be effective on December 13, 2011.

6. However, the City is currently in the process of developing procedures to implement the Ordinances and the City does not currently have an enforcement mechanism in place, and has stayed enforcement of the subject Ordinances pending the adoption of implementation procedures.

7. Efforts to implement the ordinance have included meetings with various City departments on December 6 and 13, 2011; request for foreclosure data from Hampden County Registry of Deeds; and initial analysis of foreclosure data. Additionally the City has compiled good faith estimates from all departments involved on the expected financial impact of implementing the ordinances.

8. The City does not expect to implement the subject Ordinance until this litigation is resolved.

9. According to a report produced by the Massachusetts Housing Partnership (MHP) on May 2, 2012, the City of Springfield ranked third in the state for most distressed units.[1] As of April 1, 2012, there were 1,336 distressed units in the City of

---

[1] For purposes of this report, distressed units are all those units in 1-3 family properties where a foreclosure petition has been filed or an auction scheduled in the previous year, or is bank held (up to two years).

Springfield, representing 2.17% of the housing stock. While the number of distressed units has declined in the past year, the City of Springfield's rank has jumped from 6th in April 1, 2011 to 3rd most distressed units as of April 1, 2012.[2] This indicates that the City of Springfield is experiencing more difficulty than other communities in recovering from this crisis.

10. More than half of all properties in foreclosure in Massachusetts are becoming bank-owned.[3]

11. According to a map produced by MHP using Warren Group foreclosure data from April 1, 2012, 302 foreclosure petitions were filed, 404 properties went to auction, and 326 concluded in bank-ownership.[4]

12. Single family properties represent the majority of distressed properties. According to a map produced by MHP using Warren Group foreclosure data from April 1, 2012, there were 710 distressed single-family properties in Springfield on that date.[5]

13. The data illustrates that the City of Springfield is still struggling with the impacts of the foreclosure crisis.

14. The foreclosure crisis has had negative consequences in Springfield, not only for those who have lost their homes, but also for the entire community, which is consistent with reports from experts, such as the Brookings Institute. Children whose homes are foreclosed or who are evicted from their rental home due to foreclosure

---

[2] Tim H. Davis. *Foreclosure Activity Edges Up*. Foreclosure Monitor. Boston: May 2, 2012. http://www.mhp.net/vision/resources.php?page_function=detail&resource_id=483

[3] Tim H. Davis. *Interest in Foreclosed Properties Weaker Outside Boston*. Foreclosure Monitor. Boston: January 11, 2012. http://www.mhp.net/vision/resources.php?page_function=detail&resource_id=468

[4] Massachusetts Housing Partnership. *Springfield: Distressed properties by status* (GIS Map). MHP Receivership Summit: May 30, 2012. (See Exhibit A attached hereto and incorporated herein)

[5] Massachusetts Housing Partnership. *Springfield: Distressed properties by type* (GIS Map). MHP Receivership Summit: May 30, 2012. (See Exhibit A attached hereto and incorporated herein)

suffer adverse effects, including increased stress and depression, and decreased school attendance.[6] It is estimated that 89,000 children are affected by foreclosures of owner-occupied homes in Massachusetts.[7]

15. The displacement of families has led to increased vacancies. As properties go vacant, property values have decreased. As values decrease, neighborhood residents lose equity, which can negatively impact retirement, education and other financial decisions, including the decision of whether to repair or abandon blighted properties. Ultimately, mortgages become "up-side down" and more foreclosures occur.

16. Vacant properties attract crime, and clusters of vacant properties can lead to a significant increase in criminal activity in a neighborhood. According to research on the relationship between foreclosures and crime, when the foreclosure rate increase one percentage point (0.01) the number of violent crime in a tract is expected to increase by 2.33 percent.[8]

17. In my official capacity I have worked to enforce the zoning, building, and state sanitary codes in an effort to prevent the negative effects of blight related to the foreclosure crisis.

18. The City has limited resources to allocate to these enforcement efforts.

---

[6] Julia B. Issacs. *The Ongoing Impact of Foreclosures on Children.* First Focus/The Brookings Institution. Washington, DC: April 2012.
http://www.brookings.edu/~/media/research/files/papers/2012/4/18%20foreclosures%20children%20isaacs/0418_fo reclosures_children_isaacs.pdf

[7] Julia B. Issacs. *The Ongoing Impact of Foreclosures on Children.* First Focus/The Brookings Institution. Washington, DC: April 2012.
http://www.brookings.edu/~/media/research/files/papers/2012/4/18%20foreclosures%20children%20isaacs/0418_fo reclosures_children_isaacs.pdf

[8] Dan Immergluck and Geoff Smith. *The Impact of Single-family Mortgage Foreclosures on Neighborhood Crime.* Housing Studies, Vol. 21, No. 6, 851-866, November 2006. http://www.prism.gatech.edu/~di17/HousingStudies.pdf

19. Springfield's Foreclosure Ordinances, once implemented, will require mediation to

help prevent foreclosure, and will also provide funds to help the City meet the costs

associated with the blight caused by this crisis.


Signed under penalty of perjury this 6th day of June, 2012

Geraldine McCafferty, Director, Office of Housing

8

Exhibit A



Springfield:
Distressed properties
by status

MHP

Petitions=302 properties
Auction=404 properties
Bank-owned=326 properties
tracts in top 10

Note: Distressed data is of 4/1/12
Source: The Warren Group

10



Springfield:
Distressed properties
by type

MHP

Condo=20 properties
Single-family=710 properties
Two-family=248 properties
Three-family=54 properties
tracts in top 10

0                                    1                                    2 Miles

N

Note: Distressed data is of 4/1/12
Source: The Warren Group

11



# THE ONGOING IMPACT OF FORECLOSURES ON CHILDREN

**Julia B. Isaacs**
Brookings

**April 2012**



FIRST FOCUS

*MAKING CHILDREN & FAMILIES THE PRIORITY*

# BROOKINGS

1110 Vermont Avenue NW, Suite 900 | Washington, DC 20005 | 202.657.0670 | www.firstfocus.net

12



**1**

13



THE ONGOING IMPACT OF FORECLOSURES ON CHILDREN

Five years into the foreclosure crisis, many American families with children continue to lose their homes through foreclosure. An estimated 2.3 million children in single-family homes have already lost their homes to foreclosure, and even more – 3.0 million children – are at serious risk of losing their homes in the future. Another three million or so children were evicted, or may face eviction, from rental properties that undergo foreclosure, suggesting that more than 8 million children are directly affected by the ongoing foreclosure crisis (see Figure 1). As single-family and rental properties continue to enter foreclosure, children face not just the loss of their homes, but also the risk of losing friends and falling behind academically if they are forced to switch neighborhoods and schools.

**FIGURE 1.   MORE THAN 8 MILLION CHILDREN AFFECTED BY THE FORECLOSURE CRISIS**



**Source:** Author's estimates based on research published by the Center on Responsible Lending and data on children's living arrangements from the American Community Survey (see appendix for details).

## CHILDREN AFFECTED BY FORECLOSURES

Children are the often invisible victims of the foreclosure crisis. Mortgage records do not tell how many children are in owner-occupied homes, and it is even harder to estimate the number of children in rental properties. Yet foreclosure affects not just the homeowner or landlord, but also the children living in the foreclosed properties. This brief combines state-by-state estimates on foreclosures with Census Bureau data on the living arrangements of families with children to generate estimates of the numbers of children affected

2

15



THE ONGOING IMPACT OF FORECLOSURES ON CHILDREN

by the mortgage crisis. It also synthesizes research bearing on the negative effects of foreclosure on children's schooling and overall well-being and outlines some possible policy responses.

This brief updates the author's earlier (April 2008) estimate that two million children in owner-occupied homes would be immediately affected by the foreclosure crisis, specifically on foreclosures of subprime loans made in 2005-2006.[i] Nearly four years later, the problem shows no signs of abating. In addition to the more than two million children in owner-occupied homes that already have completed foreclosure, there are even more children – more than three million – in owner-occupied homes at immediate risk of future foreclosure (as shown in Figure 1). This new analysis also is the first to quantify the millions of children in rental units affected by foreclosure.

## CHILDREN IN OWNER-OCCUPIED HOMES

An estimated 2.7 million homeowners have already lost their homes to foreclosure, according to a recent analysis by the Center for Responsible Lending (CRL). Even more owner-occupied single-family homes –3.6 million – are delinquent or in the foreclosure process, according to the CRL analysis, which tracks loans that originated in 2004 to 2008.[ii] How many children live in these homes? Data on living arrangements of children suggests that 5.3 million children across the nation live in these homes, including 2.3 million children living in homes where foreclosures have already been completed and 3.0 million living in homes at immediate risk for foreclosure (see appendix for derivation of these estimates).

This estimate is conservative for several reasons. First, it is based on loans made in a single five-year period (2004-2008). While this period captures the bulk of subprime and other risky loans, it ignores the risk of foreclosure on pre-2004 or post-2008 mortgages. Second, the estimate is based on loan status as of February 2011, not capturing those that may have become delinquent since then. Some analysts have predicted that there will be as many as 10 million foreclosures in the years ahead, an estimate that far exceeds the 3.6 million 2004-2008 loans already identified as seriously delinquent.[iii] Third, as explained in the appendix, it fails to adjust for the likelihood that loan delinquencies are higher in families with more children.

Children in every state have been affected by foreclosures, but the crisis is much worse in some states and communities than others. More than half a million children in California live in homes that have gone through a completed foreclosure and another half million are living in owner-

**MAP 1. FORECLOSURES ON OWNER-OCCUPIED HOMES HIT CHILDREN IN 10 STATES HARDEST**



▨ 1-7% of children in families with completed foreclosure or seriously delinquent mortgage

▩ 8-10% of children in such families

■ 12-19% of children in such families

3

14



occupied homes where loans are delinquent (by 60 days or more) or in the foreclosure process. In Florida, an estimated 193,000 children have gone through completed foreclosures and another 397,000 live in homes that are at an immediate, high risk of foreclosure (see Table 1).

Nationally, about one in fourteen children, or seven percent of the child population, live in households that have already gone through a completed foreclosure or are at immediate risk of foreclosure, using this conservative estimate of children in owner-occupied homes. The foreclosure crisis has been considerably worse in Arizona, California, Florida, and Nevada, where the estimates of affected children run from 12 percent (Arizona) to 19 percent (Nevada). Children in Georgia, Illinois, Maryland, Michigan and Rhode Island also are disproportionately impacted, with 8 to 10 percent of the children in these states affected by foreclosures of owner-occupied homes (see Map 1).

## CHILDREN IN RENTAL HOUSING

Foreclosures affect not just owner-occupied homes, but also rental properties, including single-family houses, small (two-to-four unit) buildings that may house both landlord and tenants, and large apartment buildings housing many families. About 25 million children, or approximately one-third of all American children, lived in rental houses and apartments in 2010, signaling the large number of children that could be affected by foreclosure of rental properties.

It is hard to get a handle on the number of rental properties facing foreclosure, or the number of children living in these properties. To get a rough ball-park, this analysis assumes that children in rental properties face the same approximate risk of foreclosure as children in owner-occupied homes with outstanding mortgages. Indeed, the Mortgage Bankers Association has estimated that more than one in five foreclosed properties are rental properties, which implies a similar foreclosure rate to other properties since about one in five properties in the United States are rental properties.[iv] Under this assumption, combined with Census Bureau data on the number of children living in rental properties as compared with owner-occupied homes with mortgages, there are approximately three million children living in rental units directly affected by the foreclosure process.

Adding the three million children in rental housing to the 5.3 million in owner-occupied homes, the total number of children affected by the foreclosure crisis rises to more than 8 million. In other words, more than one in ten American children (11 percent) are affected by the foreclosure crisis, under relatively conservative assumptions, and more than one third of these children live in rental housing.

The rental housing component of the estimate is quite rough, and so does not allow estimates by state, or distinctions between foreclosures that have already happened and those that are still to come. Note that the estimate only includes children living in homes or apartment buildings under foreclosure, not the children in near-by homes who may be indirectly affected by the negative effects of foreclosure on entire neighborhoods.

## EFFECTS OF FORECLOSURES ON CHILDREN

Foreclosure may affect children negatively through at least four different pathways. First, and most obviously, families receiving foreclosure notices are much more likely to move than other families, and, as discussed further below, children who move frequently do less well in school. Second, homeowners receiving a foreclosure notice are under a lot of financial and psychological stress, as they struggle to stay in their house, and if that fails, to find a new home quickly. A body of research dating back to the Great Depression finds that job loss and other forms of economic hardship can affect the way parents interact with each other and their children. In particular, parents under a lot of financial distress sometimes engage in harsher and less

**4**



THE ONGOING IMPACT OF FORECLOSURES ON CHILDREN

**TABLE 1.    CHILDREN AFFECTED BY FORECLOSURES OF OWNER-OCCUPIED HOMES IN EACH STATE**

| State | HMDA Loans Originated 2004-2008 | Completed Foreclosures (February 2011) | | Delinquent (60+ Days) or in Foreclosure | | Total Affected Children | |
|---|---|---|---|---|---|---|---|
| | | % of Loans | Children | % of Loans | Children | Number | Percent |
| Alabama | 554,842 | 5 | 22,000 | 7 | 29,000 | 52,000 | 5 |
| Alaska | 87,013 | 3 | 2,000 | 3 | 2,000 | 4,000 | 2 |
| Arizona | 1,247,396 | 11 | 125,000 | 9 | 93,000 | 218,000 | 14 |
| Arkansas | 292,161 | 5 | 13,000 | 7 | 17,000 | 30,000 | 4 |
| California | 6,163,181 | 9 | 575,000 | 9 | 522,000 | 1,097,000 | 12 |
| Colorado | 884,382 | 8 | 54,000 | 5 | 34,000 | 88,000 | 8 |
| Connecticut | 535,567 | 3 | 15,000 | 8 | 36,000 | 51,000 | 6 |
| Delaware | 142,386 | 2 | 2,000 | 8 | 9,000 | 11,000 | 6 |
| District of Columbia | 95,638 | 3 | 1,000 | 5 | 2,000 | 4,000 | 4 |
| Florida | 3,096,957 | 8 | 193,000 | 17 | 397,000 | 589,000 | 15 |
| Georgia | 1,325,686 | 8 | 93,000 | 9 | 99,000 | 192,000 | 8 |
| Hawaii | 157,167 | 3 | 3,000 | 7 | 7,000 | 10,000 | 3 |
| Idaho | 243,640 | 5 | 12,000 | 6 | 13,000 | 25,000 | 6 |
| Illinois | 1,994,547 | 5 | 98,000 | 9 | 169,000 | 267,000 | 9 |
| Indiana | 842,079 | 6 | 44,000 | 8 | 57,000 | 101,000 | 6 |
| Iowa | 349,807 | 4 | 12,000 | 5 | 16,000 | 29,000 | 4 |
| Kansas | 344,646 | 5 | 14,000 | 5 | 15,000 | 29,000 | 4 |
| Kentucky | 467,437 | 5 | 17,000 | 6 | 22,000 | 39,000 | 4 |
| Louisiana | 473,188 | 3 | 14,000 | 8 | 31,000 | 45,000 | 4 |
| Maine | 175,572 | 3 | 4,000 | 8 | 9,000 | 13,000 | 5 |
| Maryland | 1,166,363 | 4 | 39,000 | 8 | 73,000 | 113,000 | 9 |
| Massachusetts | 968,157 | 4 | 36,000 | 7 | 54,000 | 89,000 | 6 |
| Michigan | 1,373,627 | 13 | 147,000 | 8 | 88,000 | 234,000 | 10 |
| Minnesota | 760,728 | 8 | 57,000 | 5 | 37,000 | 94,000 | 7 |
| Mississippi | 270,619 | 7 | 15,000 | 10 | 22,000 | 37,000 | 5 |
| Missouri | 875,321 | 6 | 45,000 | 5 | 38,000 | 83,000 | 6 |
| Montana | 111,479 | 2 | 2,000 | 4 | 4,000 | 6,000 | 3 |
| Nebraska | 197,381 | 4 | 8,000 | 5 | 8,000 | 16,000 | 4 |
| Nevada | 540,438 | 14 | 63,000 | 14 | 58,000 | 121,000 | 19 |
| New Hampshire | 202,757 | 5 | 8,000 | 6 | 9,000 | 17,000 | 6 |
| New Jersey | 1,303,524 | 2 | 28,000 | 10 | 114,000 | 142,000 | 7 |
| New Mexico | 244,840 | 3 | 5,000 | 6 | 12,000 | 17,000 | 3 |
| New York | 1,615,117 | 2 | 30,000 | 10 | 141,000 | 171,000 | 4 |
| North Carolina | 1,214,972 | 4 | 34,000 | 6 | 59,000 | 93,000 | 4 |
| North Dakota | 63,753 | 2 | 1,000 | 3 | 1,000 | 2,000 | 2 |
| Ohio | 1,421,055 | 7 | 79,000 | 9 | 98,000 | 176,000 | 6 |
| Oklahoma | 393,029 | 4 | 13,000 | 6 | 19,000 | 32,000 | 4 |
| Oregon | 565,895 | 4 | 17,000 | 6 | 26,000 | 43,000 | 5 |
| Pennsylvania | 1,575,238 | 3 | 33,000 | 7 | 85,000 | 118,000 | 4 |
| Rhode Island | 170,153 | 6 | 9,000 | 8 | 12,000 | 21,000 | 9 |
| South Carolina | 557,836 | 4 | 16,000 | 8 | 31,000 | 47,000 | 5 |
| South Dakota | 87,152 | 3 | 2,000 | 4 | 3,000 | 5,000 | 3 |
| Tennessee | 800,639 | 6 | 35,000 | 7 | 45,000 | 79,000 | 6 |
| Texas | 2,452,504 | 6 | 136,000 | 6 | 156,000 | 292,000 | 5 |
| Utah | 457,963 | 4 | 22,000 | 5 | 30,000 | 52,000 | 7 |
| Vermont | 75,655 | 1 | 1,000 | 5 | 3,000 | 4,000 | 3 |
| Virginia | 1,407,760 | 6 | 71,000 | 5 | 58,000 | 128,000 | 7 |
| Washington | 1,167,337 | 3 | 30,000 | 6 | 58,000 | 88,000 | 6 |
| West Virginia | 188,882 | 5 | 7,000 | 6 | 8,000 | 15,000 | 4 |
| Wisconsin | 843,467 | 4 | 33,000 | 6 | 45,000 | 78,000 | 6 |
| Wyoming | 71,277 | 3 | 2,000 | 3 | 2,000 | 4,000 | 3 |
| **U.S. Total** | **42,618,210** | **6** | **2,340,000** | **8** | **2,980,000** | **5,310,000** | **7** |

Note: Numbers may not add due to rounding. Source: Center for Responsible Lending (CRL) and author's estimates based on data from CRL and the American Community Survey, as explained in the appendix.

16



supportive parenting, which in turn can lead to negative behaviors on the part of children, making it harder for them to interact well with peers and in school.[v] Third, foreclosures and housing instability have a negative impact on physical as well as mental health, with studies finding higher rates of non-elective visits to emergency rooms and hospitals in ZIP codes with the highest foreclosure rates, as well as a strong association between housing instability and postponement of needed health care visits and necessary medications.[vi] Finally, because foreclosures are often highly concentrated in certain neighborhoods, children living in or near foreclosed homes may suffer the consequences of living in neighborhoods with more vacant houses, higher crime rates, lower social cohesion, and a lower tax base.[vii]

Children living in rental housing undergoing foreclosure may face many of the same negative effects as children of homeowners, as their parents may be forced to move with little advance notice, and their neighborhoods may also enter into decline. Renters often do not know of the financial problems of their landlords, and until recently, faced possible eviction with little advance notice. With enactment of the Protecting Tenants at Foreclosure Act in 2009, renters must be provided 90 days advance notice prior to eviction after a foreclosure, and, in fact, have the legal right to stay in the building through the terms of a valid long-term lease. Even so, many tenants do not know their new legal rights and may feel forced to leave in response to threatening letters from the new owners of foreclosed properties. Furthermore, the legal protections are temporary because the act is set to expire in 2014. In addition, many families who remain in properties undergoing foreclosures may face deteriorating living conditions, as financially strapped landlords stop paying for ongoing maintenance and repairs.[viii] In the end, many families in rental housing, as well as families in owner-occupied housing, find themselves moving after a foreclosure notice.

## Negative Effects of Mid-Year Changes in Schools

A number of research studies have documented the negative effect of non-promotional school changes on student achievement. Children who switch schools have lower levels of math and reading achievement than their more stable peers, even after controlling for poverty and other family characteristics that are associated with both residential mobility and poor academic performance. Each move is associated with a reduction in math and reading scores by about one-tenth of a standard deviation, which is equivalent to about one month of school, according to a synthesis of 16 different studies.[ix]

Frequent changes in schools at both the elementary and high school level also is associated with higher rates of high school drop out, according to the same review. Dropping out may be due to a combination of academic and behavioral issues. Moving schools can be stressful; one student in California explains:

> "It's hard to change schools 'cause, well, I don't know about other people, but to me it's hard because I'm not the type of person to make friends real quick."[x]

Teachers and principals interviewed by the Governmental Accountability Office reported concerns about children's social adjustment, as well as challenges in adjusting the pace of instruction for new students and getting school records transferred in a timely manner.[xi] Time devoted to new students affects not only students who move, but also can have a negative effect on other students, because of teacher and school resources spent on high student turnover.[xii] This is another example of how high rates of foreclosure and student mobility can have impacts on the whole community, not just the students directly affected.

Much of the existing research focuses on all types of student mobility, not just moving after foreclosure. Additional challenges may face students and schools affected by foreclosure, where children are moving quickly and under conditions of financial duress. Some recent studies are trying to look at the specific effects of foreclosure on student outcomes:

- A study of foreclosures in Baltimore found that almost all (97 percent) of the city's schools had at least one student who lived in a property that received a foreclosure notice in the 2008-09 school

6

17



THE ONGOING IMPACT OF FORECLOSURES ON CHILDREN

year. Most schools had fewer than 10 students affected by foreclosure, but two schools had 50 or more affected students, including one elementary school and one high school.[xiii]

- Similar studies that linked educational records with notices on property foreclosures in New York City and the District of Columbia have documented that public school children living in homes and apartment buildings that enter the foreclosure process are more likely than other children to change residences and schools.[xiv]

- Children affected by foreclosure in New York City tended to move to schools of lower quality. Researchers also observed a similar downward shift in school performance for children who move for reasons other than foreclosure.[xv]

- Additional research is being conducted in New York City and cities in California and Florida to examine the effects of foreclosure on the children's test scores and other measures of academic performance; findings from this ongoing research are not yet available.[xvi]

## CONCLUSION AND POLICY IMPLICATIONS

Millions of children have already been affected by foreclosures of their home or apartment building, but even more are expected to be affected in the future. What policies can address this ongoing disruption in the lives of so many children?

One targeted response would be to help children and schools adjust to high levels of mobility across schools. For more than two decades, the McKinney-Vento Education for Homeless Children and Youth program has provided schools with resources to identify homeless students and provide them with services designed to allow them to stay in their schools even if they are forced to move outside their home district. The foreclosure crisis is only one factor contributing to homelessness, but school districts and state departments of education identified it as the third most common reason given for the increase in homeless children in 2010.[xvii] While we know the McKinney-Vento Homeless Education program is helping identify and assist a number of homeless students to maintain stability and stay in their school of origin, the program has not been evaluated to determine whether it is reaching its potential effectiveness. Moreover, the program does not address the needs of students who move in the middle of the year, but are not homeless. Other school policies may be helpful in addressing high student mobility, such as improving intake procedures for new students, requiring old schools to transmit student records in a timely fashion, developing educational resources about student mobility for both families and school personnel, and targeting additional resources, such as family resource centers, on schools with unusually high rates of student mobility.[xviii]

Although education policies can mitigate the negative effects of students moving across schools, the root problem is not in education, but in housing – the exceedingly high number of foreclosures in many parts of the country. Some of these foreclosures may be unavoidable, but others could be prevented through more aggressive policies to encourage loan modifications.

In many cases, loan modifications can be a less costly alternative – for both lenders and borrowers – than foreclosure. Yet, lenders have been reluctant to modify loans in large numbers. The Home Affordable Modification Program (HAMP) and other new federal programs designed to prevent foreclosures have fallen short in their implementation, with only a fraction of the $50 billion allocated for such programs spent, far fewer homeowners served than expected, and numerous complaints about lost documents, unfair denials of loan modifications and other poor practices among the loan servicers that have voluntarily joined the programs.[xix] In October 2011, the Administration announced revisions to one of these programs, the Home Affordable Refinance Program (HARP), in an effort to expand its reach to more homeowners who are underwater (owing more on the mortgage then the depreciated value of their house). While these revisions are a step in the right direction, implementation of these revisions has been slow and the revised HARP still fails to reach many homeowners at risk of foreclosure.[xx]

7



Bolder steps may be needed given the lackluster performance of the voluntary loan modification programs and the ongoing drag that the cycle of foreclosures and declining housing prices is placing on the economy. Such steps might include developing national standards for the mortgage servicing industry, resurrecting the 2009 legislation that would amend bankruptcy laws to allow judges to modify mortgages on residential property, and following one of several creative proposals for permitting reductions in loan principal for homeowners under certain circumstances (for example, allowing the lender to share in future appreciation, tying the principal reductions to timely payment of modified loans or targeting assistance to certain ZIP codes).[xxi] While these bolder steps are not without complication, they merit further consideration in face of the slowness of the economic recovery and the millions of children and families adversely affected by the foreclosure crisis.

Unfortunately, the flood of foreclosure will continue even if aggressive policies are adopted, and so public policies should also consider how to help children, families and communities move through the foreclosure crisis with as little damage as possible. For example, a recent white paper by the Federal Reserve encourages the conversion of foreclosed properties to rental properties, in order to reduce the number of vacant properties on the market and increase the supply of rental housing.[xxii] In addition, the President's FY 2013 Budget is requesting $1 billion in funding for the National Housing Trust Fund, which was created by Congress in 2008 to increase and preserve the supply of affordable rental housing for low-income families, but has not yet been funded.[xxiii] Given the fact that many children from foreclosed homes move into rental homes – and, as this brief has shown, millions of children in rental housing are directly affected by the foreclosure crisis, it is important to consider rental housing as well as home ownership when thinking about policy responses to the mortgage crisis.

8

14



THE ONGOING IMPACT OF FORECLOSURES ON CHILDREN

## APPENDIX: METHODOLOGY FOR ESTIMATING THE NUMBER OF CHILDREN AFFECTED BY FORECLOSURES

Data on foreclosures contains limited demographic data, and so information from different data sets must be combined to estimate the number of children affected by foreclosure. Data sources and key assumptions are outlined below, first for owner-occupied housing and then for rental housing.

### Owner-Occupied Housing

The estimate of children living in owner-occupied homes affected by foreclosure is based on foreclosures and delinquency estimates made by the Center on Responsible Lending (CRL) in their recent publication, *Lost Ground, 2011: Disparities in Mortgages and Foreclosures*. CRL matched data on loan performance from two national, proprietary data sets (Lender Processing Services and BlackBox) with data on loans originating between 2004 and 2008 as reported under the Home Mortgage Disclosure Act (HMDA). They then examined loan performance as of February 2011 in the matched data set (of 27 million loans) and applied the percentage of foreclosures (6.4 percent) and serious delinquencies (8.3 percent) to the universe of 42.9 million first-lien owner-occupied mortgages in the HMDA data set, resulting in estimates of 2.7 million homes that had completed a foreclosure and 3.6 million homes that were in serious delinquency (60 or more days delinquent or in the foreclosure process). In addition to the summary foreclosure and delinquency rates by state shown in Table 1, the CRL web site provides additional tables providing estimates by racial/ethnic group within each state, documenting the disproportionate impact of the foreclosure crisis on African-Americans and Hispanics.[xxiv]

CRL estimates of foreclosures and delinquencies by state and race/ethnicity were combined with unpublished tabulations of American Community Survey (ACS) data on the number of children per household, in owner-occupied homes with outstanding mortgages, again disaggregated by state and race/ethnicity.[xxv] The same racial groups were used in the ACS tabulations as in the CRL analysis (Non-Hispanic White, Black, Non-Black Hispanics, Asians and Other/Missing) to facilitate estimates of children, in households with completed foreclosures and delinquencies, in each state by race/ethnic group. These detailed tabulations were summed across racial/ethnic groups to arrive at the state estimates shown in Table 1. The final columns in Table 1 show the sum of children affected (across completed foreclosures and delinquencies) and expresses that as a percentage of the state's child population in 2010. Numbers and percentages are rounded to highlight the uncertainty in the estimates.

The key underlying assumption is that homeowners who default on mortgages have roughly the same number of children (and the same rates of childlessness) as all homeowners with outstanding mortgages in their state and racial/ethnic group. In fact, analysis of past defaults suggests that households with more children are more likely to be delinquent on housing payments than households with fewer children, suggesting that this estimate of affected children is conservative.[xxvi]

### Rental Housing

ACS data on children's living arrangements were used to generate a rough estimate of the children living in rental housing. Tabulations of ACS data indicate there are 0.58 children living in rental housing for every child living in owner-occupied housing with an outstanding mortgage. Applying this ratio to the 5.3 million estimate of children living in owner-occupied homes affected by foreclosure results in an estimate of roughly three million children living in rental housing affected by foreclosure.

This approach is only sensible if one assumes that the foreclosure rate for rental properties has been roughly similar to the rate for owner-occupied properties. As already noted, about one in five or 20 percent of

**9**

26



delinquent mortgages were for rental properties, according to a 2008 report of the Mortgage Bankers Association.[xxvii] Rental properties also comprise about one-fifth of all housing properties, according to ACS data on rental units and adjustments for properties with multiple units. This similarity in proportion of rental units (among foreclosed and all properties) supports an assumption of similar rates of foreclosure.

This comparison is somewhat shaky, however, because there is some evidence that the mix of properties undergoing foreclosure has been shifting in the past five years. Studies linking public school records with foreclosure notices in both D.C. and Baltimore find that the number of public students living in rental as opposed to owner-occupied buildings entering the foreclosure process has risen between 2004 and 2009 in both cities.[xxviii] This apparent shift in the ratio of rental as opposed to owner-occupied foreclosures makes it harder to assert with confidence that the foreclosure rates of the two types of properties are similar at any one point in time.

For another plausibility check, note that the estimate of 3 million children in rental housing out of more than 8 million children in all types of foreclosed housing implies that 37 percent of all children affected by foreclosure live in rental housing. This is roughly consistent with estimates of the percentage of foreclosed units that are rental units: analyses of state and local data suggest that 38 percent of foreclosed units in California and 45 percent of foreclosed units in southern New England are rental units, and researchers at the National Low Income Housing Coalition have estimated that roughly 40 percent of foreclosed units nationally are rental units.[xxix]

As a final comparison, the estimate that 11 percent of children are affected by foreclosure is much higher than estimates that 2 percent of school children are affected by foreclosures (owner-occupied or rental) in Baltimore, the District of Columbia and New York City.[xxx] However, the 2 percent local estimates s are for children in properties entering foreclosure in a single year, while the 11 percent national estimate is for children affected at any time in the current crisis, making it difficult to directly compare the two estimates.

## Acknowledgements

The author thanks Alex Gold of the Brookings Institution for research assistance.

[i] Phillip Lovell and Julia Isaacs, *The Impact of the Mortgage Crisis on Children*, Alexandria, VA: First Focus, May 2008.

[ii] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgages and Foreclosures Lost Ground*. Durham, NC: Author, November 2011.

[iii] See "Testimony of Laurie S. Goodman, Amherst Securities Group to the Subcommittee on Housing, Transportation and Community Development of the Senate Committee on Banking, Housing and Urban Affairs. Topic— New Ideas to Address the Glut of Foreclosed Properties, (September 20, 2011) at http://banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=dc3d9918-5aca-47b2-9ce4-b9daaef67957.

[iv] See appendix and footnote xxvii for further information.

[v] Vonnie McLoyd, "The Impact of Economic Hardship on Black Families and Children: Psychological Distress,Parenting, and Socioemotional Development, *Child Development*, Vol. 61, No. 2, (Apr., 1990), pp.311-346.

[vi] Janet Currie and Erdal Tekin, "Is the Foreclosure Crisis Making Us Sick?" NBER Working Paper 17310, August 2011; and Margot B Kushel, Reena Gupta, Lauren Gee, and Jennifer S Haas, "Housing Instability and Food Insecurity as Barriers to Health Care among Low-Income Americans." *Journal of General Internal Medicine*. 2006 January; 21(1): 71–77. In addition to these two studies, which document health effects of foreclosure and housing instability on non-elderly adults, there are several studies documenting health effects of homelessness on children (e.g., L. Weinreib et al., "Determinants of Health and Service Use Patterns in Homeless and Low-Income Housed Children," 102 Pediatrics, 554-562 (1998).

[vii] G. Thomas Kingsley, Robin Smith, and David Price, *The Impact of Foreclosures on Families and Communities*. Washington D.C.: The Urban Institute, May 2009.

[viii] Joint Center for Housing Studies, *Rental Market Stresses: Impacts of the Great Recession on Affordability and Multifamily Lending*. Cambridge, MA: Harvard Joint Center for Housing Studies, July 2011.

[ix] Arthur J. Reynolds, Chin-Chih Chen, and Janette E. Herbers. "School Mobility and Educational Success: A Research Synthesis and Evidence on Prevention." Paper presented at the Workshop on the Impact of Mobility and Change on the Lives of Young Children, Schools, and Neighborhoods, Board on Children, Youth, and Families, National Research Council, June 29-30, 2009, Washington, DC.

[x] Russell Rumberger, "The Causes and Consequences of Student Mobility," *Journal of Negro Education*. Vol 72, No. 1, pp. 6-21, (2003).

2/



xi U.S. Governmental Accountability Office. *Many Challenges Arise in Educating Students Who Change Schools Frequently.* GAO 11-40. Washington, DC: Author, 2011.

xii Rumberger (2003) and Eric A. Hanushek, John F. Kain, Steven G. Rivkin, "Disruption versus Tiebout improvement: the costs and benefits of switching schools," *Journal of Public Economics* 88 (2004) 1721– 1746.

xiii Matthew Kachura, *Children and Foreclosures: Baltimore City, An Examination of Students Affected by Foreclosures, 2003-2008.* Baltimore, MD: The Baltimore Neighborhood Indicators Alliance - Jacob France Institute at the University Baltimore, Winter 2011.

xiv Vicki Been, Ingrid Gould Ellen, Amy Ellen Schwartz, Leanna Stiefel, and Meryle Weinstein, "Does Losing Your Home Mean Losing Your School?: Effects of Foreclosures on the School Mobility of Children" *Regional Science and Urban Economics* 41 (2011) 407-411 and Jennifer Comey and Michel Grosz, *Where Kids Go: The Foreclosure Crisis and Mobility In Washington, D.C.* Washington, DC: Urban Institute, 2011.

xv Been et al, 2011.

xvi New York University press release (February 11, 2011), "NYU Researchers Win MacArthur Foundation Grant to Study Housing Instability and Student Outcomes," at http://www.nyu.edu/about/news-publications/news/2011/02/11/nyu-researchers-win-macarthur-foundation-grant-to-study-housing-instability-and-student-outcomes.html.

xvii First Focus and the National Association for the Education of Homeless Children and Youth, *A Critical Moment: Child & Youth Homelessness in Our Nation's Schools.* Washington, DC: Authors, 2010.

xviii For other ideas on school-centered strategies for addressing high rates of student mobility see Rumberger, 2003 and Alexandra Beatty, Rapporteur, *Mobility: Exploring the Impact of Frequent Moves on Achievement: Summary of a Workshop.* Washington, DC: National Academy Press, 2010.

xix U.S. Governmental Accountability Office. *TROUBLED ASSET RELIEF PROGRAM: Results of Housing Counselors Survey on Borrowers' Experiences with the Home Affordable Modification Program* GAO-11-367R. Washington, DC: Author, 2011; Katie Buitrago, "Treasury penalizes servicers not performing up to standards: April HAMP Analysis." Chicago: Regional Homeowners Preservation Institute, 2010, http://regionalhopi.org/content/tracking-loan-modifications) and Zachary A. Goldfarb, "Obama's efforts to aid homeowners, boost housing market fall far short of goals" *The Washington Post*, October 23, 2011. at http://www.washingtonpost.com/business/economy/obamas-efforts-to-aid-homeowners-boost-housing-market-fall-far-short-of-goals/2011/09/22/gIQAoJdeAM_story.html.

xx Karen Dynan, "Playing the HARP: A New Way Forward on Housing?" October 24, 2011, http://www.brookings.edu/opinions/2011/1024_housing_dynan.aspx and Vickie Elmer, "Helping Homeowners Dig Out," *The New York Times*, December 15, 2011. http://www.nytimes.com/2011/12/18/realestate/expanding-a-federal-refinancing-program.html?_r=3&ref=loanmodifications.

xxi For more on these and other policy proposals related to loan modifications, see Williams Galston, "Three Ways President Obama Can Fix the Housing Crisis," *The New Republic*, July 19, 2011; the Center for Responsible Lending, *Facing the Foreclosure Crisis: Four Urgent Needs to Address Now* (CRL Policy Brief, November 2011) and Floyd Norris, "Time to Accelerate the Housing Recovery, *The New York Times*, December 2, 2011, Page B1.

xxii Board of Governors of the Federal Reserve System, "The U.S. Housing Market: Current Conditions and Policy Considerations." Washington, DC: Author, January, 2012.

xxiii The White House, "Fact Sheet President Obama's Plan to Help Responsible Homeowners and Heal the Housing Market" February 2, 2012, at http://www.whitehouse.gov/the-press-office/2012/02/01/fact-sheet-president-obama-s-plan-help-responsible-homeowners-and-heal-h.

xxiv Center for Responsible Lending, "State Rates of Completed Foreclosure and Serious Delinquency, by Borrower Race and Ethnicity (2004-2008 Originations), at http://www.responsiblelending.org/mortgage-lending/research-analysis/lost-ground-State-data-by-borrower-race-ethnicity.pdf.

xxv The tabulations were done on a five-year (2005-2009) data set available through the Integrated Public Use Microdata Series (IPUMS); the tabulations were done on five years rather than one year to improve precision of estimates of children in households with outstanding mortgages by race/ethnicity within each state. Steven Ruggles, J. Trent Alexander, Katie Genadek, Ronald Goeken, Matthew B. Schroeder, and Matthew Sobek. Integrated Public Use Microdata Series: Version 5.0 [Machine-readable database]. Minneapolis: University of Minnesota, 2010.

xxvi Glenn Canner, Stuart Gabriel and J. Michael Wooley, "Race, Default Risk and Mortgage Lending: A Study of the FHA and Conventional Loan Markets," *Southern Economic Journal*, Vol. 58, No. 1 (July 1991) pp. 249-262.

xxvii Mortgage Bankers Association, 2008, cited in Danilo Pelletiere, *Renters in Foreclosure: Defining the Problem, Identifying Solutions.* Washington, DC: National Low Income Housing Coalition, January 2009.

xxviii Kachura, 2011 and Jennifer Comey and Michael Grosz, 2010. *Smallest Victims of the Foreclosure Crisis: Children in the District of Columbia.* Washington, DC: The Urban Institute, 2010.

xxix Gabe Treves. *California Renters in the Foreclosure Crisis.* Third Annual Report (San Francisco, CA: Tenants Together: January 2011); Danilo Pelletiere and Keith Wardrip, Renters and the Housing Credit Crisis, *Poverty & Race*, Vol. 17, No. 4 (July/August 2008) and Pelletiere, 2009.

xxx Kachura, 2011; Comey and Grosz, 2011, and Been et al., 2011.