NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11612

EASTHAMPTON SAVINGS BANK & others[1]  vs.  CITY OF SPRINGFIELD.


     Suffolk.     September 4, 2014. - December 19, 2014.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
                          Hines, JJ.


Constitutional Law, Home rule, Home Rule Amendment.  Municipal
     Corporations, Home rule, By-laws and ordinances, Fees.
     Mortgage, Foreclosure.  Massachusetts Oil and Hazardous
     Material Release Prevention Act.  State Sanitary Code.


     Certification of questions of law to the Supreme Judicial
Court by the United States Court of Appeals for the First
Circuit.


     Tani E. Sapirstein for the plaintiffs.
     Thomas D. Moore, Associate City Solicitor (Lisa C. deSousa,
Associate City Solicitor, with him) for the defendant.
     The following submitted briefs for amici curiae:
     Lee D. Goldstein for Harvard Legal Aid Bureau & others.
     Robert G. Rowe, III, of the District of Columbia, for
American Bankers Association, Inc.
     Francis J. Nolan & Nathalie K. Salomon for Real Estate Bar
Association for Massachusetts, Inc., & another.
     Michael McDonagh for Massachusetts Association of Realtors.

---

[1] Chicopee Savings Bank, Hampden Bank, United Bank, Monson
Savings Bank, and Country Bank for Savings.

Henry C. Luthin, First Assistant Corporation Counsel, & Brandon H. Moss for Massachusetts Municipal Lawyers Association, Inc.

William F. Sheehan, of the District of Columbia, & Brenda R. Sharton & Thomas M. Hefferon for Massachusetts Bankers Association, Inc.

SPINA, J.  We consider in the present case challenges brought against two ordinances adopted by the city of Springfield (city) in response to a wave of foreclosures triggered by the economic downturn of 2008.  The United States Court of Appeals for the First Circuit has certified the following questions to this court, pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981):[2]

"1.  Are Springfield's municipal ordinances Chapter 285, Article II, 'Vacant or Foreclosing Residential Property' (the [f]oreclosure [o]rdinance) or Chapter 182, Article I, 'Mediation of Foreclosures of Owner-Occupied Residential Properties' (the [m]ediation [o]rdinance) preempted, in part or in whole, by those state laws and regulations identified by the plaintiffs?

"2.  Does the [f]oreclosure [o]rdinance impose an unlawful tax in violation of the Constitution of the Commonwealth of Massachusetts?"

Easthampton Sav. Bank v. Springfield, 736 F.3d 46, 53 (1st Cir. 2013).

---

[2] Supreme Judicial Court Rule 1:03, as appearing in 382 Mass. 700 (1981), provides:  "This court may answer questions of law certified to it by . . . a Court of Appeals of the United States . . . when requested by the certifying court if there are involved in any proceeding before it questions of law of this State which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of this court."

We answer the first question that the mediation ordinance is preempted by G. L. c. 244 and that the foreclosure ordinance is preempted by G. L. c. 21E and G. L. c. 111 but not by G. L. c. 244.  We answer the second question in the negative.[3]

1.  Procedural background.  We summarize certain undisputed facts in the order of certification and in the record before us. In 2011, in response to an increased number of foreclosures due to the housing market collapse of 2008 and its effect on public safety, the city enacted two ordinances addressing properties left vacant during or after the foreclosure process.  The plaintiffs, six banks holding mortgage notes on properties in Springfield, filed suit in State court seeking declaratory and injunctive relief from the enforcement of the ordinances.  The defendant city removed the case to Federal court.  The Federal District Court allowed the city's motion for summary judgment. The plaintiffs appealed to the United States Court of Appeals for the First Circuit.  That court determined that the outcome of the case centered on unresolved questions of Massachusetts

---

[3] We acknowledge the amicus briefs filed by the Massachusetts Bankers Association, Inc.; the American Bankers Association, Inc.; the Massachusetts Association of Realtors; and the Real Estate Bar Association for Massachusetts, Inc., and the Abstract Club in support of the plaintiffs, and the Harvard Legal Aid Bureau, National Consumer Law Center, National Community Reinvestment Coalition, Massachusetts Law Reform Institute, and Massachusetts Alliance Against Predatory Lending; and the Massachusetts Municipal Lawyers Association, Inc., in support of the defendants.

law better suited for this Court.  We now consider the questions
presented to this court.

2.  <u>Springfield ordinances</u>.  The two ordinances deal
specifically with the foreclosure process.  The mediation
ordinance is entitled "Facilitating Mediation of Mortgage
Foreclosures of Owner Occupied Residential Properties" and is
codified in Chapter 7.60 of Title 7 of the Revised Ordinances of
the city of Springfield, 1986, as amended (city ordinances).
The foreclosure ordinance is entitled "Regulating the
Maintenance of Vacant and/or Foreclosing Residential Properties
and Foreclosures of Owner Occupied Residential Properties," and
is codified in Chapter 7.50 of Title 7 of the city ordinances.

a.  <u>Mediation ordinance</u>.  The mediation ordinance
establishes a program requiring mandatory mediation between
mortgagors and mortgagees.  The ordinance requires that, upon
giving notice of a default and the statutory right of redemption
to the mortgagor, mediation must begin within forty-five days.
The mediation consists of a conference between the mortgagor and
mortgagee in which the parties must make a good faith effort to
renegotiate the terms of the mortgage that was the subject of
the notice or otherwise to resolve the pending foreclosure.  If,
after a mediation conference, the city-provided mediation
program manager determines that the mortgagee has made a good
faith effort to mediate but that the parties were unable to come

to an agreement to avoid foreclosure, the manager will issue a
certificate stating that the mortgagee has satisfied the
requirements of the mediation ordinance and authorizing the
mortgagee to proceed with its rights pursuant to G. L. c. 244.
Failure of a mortgagee to comply with the mediation ordinance
results in a $300 fine with each day of noncompliance
constituting a separate violation.

b.  <u>Foreclosure ordinance</u>.  The foreclosure ordinance
requires owners of buildings that are vacant or undergoing
foreclosure to register with the city.  The definition of
"owner" includes "a mortgagee of any such property who has
initiated the foreclosure process."  Under the ordinance, the
mortgage foreclosure process is initiated by "taking possession
of a residential property pursuant to [G. L. c. 244, § 1]; [or
by] commencing a foreclosure action on a property in any court
of competent jurisdiction, including without limitation, filing
a complaint in Land court under the Servicemembers Civil Relief
Act -- Public Law 108-189 (50 U.S.C.S. App. § 501-536)."  In
addition, "where the mortgage authorizes [the] mortgagee entry
to make repairs upon the mortgagor's failure to do so," the
mortgagee has "initiated" the foreclosure process.  Read
together, a mortgagee whose mortgage expressly authorizes entry
to make repairs upon the mortgagor's failure to do so is an

owner under the ordinance without any consideration as to whether the mortgagor has vacated the property.

Under the foreclosure ordinance, an "owner" as defined in the ordinance is responsible for the maintenance of the property.  The ordinance specifies the minimum requirements of maintenance, including the filing of a space utilization plan with the fire commissioner; the removal of hazardous material from the property; the securing of windows and doorways or the provision of twenty-four hour on-site security; the removal of trash, debris, and stagnant water; the draining of water from plumbing if the property is vacant; the procurement of liability insurance for the property; and the provision of a $10,000 cash bond against the possibility of noncompliance.  Upon the satisfaction of these conditions, the city will issue a certificate of compliance to the owner.

If an owner fails to register a vacant or foreclosing property with the city and to obtain a certificate of compliance, the building commissioner, once notified, is empowered to give notice and order the owner to bring the property into compliance with the foreclosure ordinance. Failure to comply with an order to register and its attendant conditions authorizes the building commissioner and his agents to enter the property to inspect it and bring it into compliance with the ordinance.  An owner must pay any expenses incurred by

the commissioner in securing an unregistered property within
seven days of receipt of notice, or the city may file a notice
of claim against the property and obtain a lien.  The
ordinance's requirement of a $10,000 bond ensures that, should
the owner of a property subject to the ordinance fail to
maintain the property according to the strictures of the
ordinance, the city will be able to recoup the costs of entering
the property and satisfying the maintenance requirements.  If
the property is registered and the owner fails to pay the
expenses incurred by the city, the city may draw down the posted
bond.  Furthermore, the city will retain an unspecified portion
of the bond as "an administrative fee to fund an account for
expenses incurred in inspecting, securing, and marking said
building and other such buildings that are not in compliance
with [the foreclosure ordinance]."[4]  Finally, failure to comply
with the foreclosure ordinance results in a $300 per day fine
with each day constituting a separate violation.

   3.  Preemption.  The Home Rule Amendment authorizes a
municipality by ordinance or bylaw to "exercise any power or
function which the general court has power to confer upon it,
which is not inconsistent with the constitution or laws enacted
by the general court in conformity with powers reserved to the

---

   [4] The city has represented that this fee would likely be
between $500 and $1000.  Easthampton Sav. Bank v. Springfield,
736 F.3d 46, 49 n.3 (1st Cir. 2013).

general court by section eight" of the Home Rule Amendment.  See
art. 89, § 6, of the Amendments to the Massachusetts
Constitution.  See also G. L. c. 43B, § 13 (Home Rules
Procedures Act).  Municipal bylaws are presumed to be valid.
Marshfield Family Skateland, Inc. v. Marshfield, 389 Mass. 436,
440 (1983).  The plaintiffs argue that the ordinances are
inconsistent with several laws enacted by the General Court and
thus are unconstitutional.  The city argues that no conflict
exists with the specified laws and that, should this court
conclude otherwise, the foreclosure ordinance by its own
language avoids any conflict.

In determining whether a local ordinance or bylaw is
inconsistent with a State statute, the "question is not whether
the Legislature intended to grant authority to municipalities to
act . . . , but rather whether the Legislature intended to deny
[a municipality] the right to legislate on the subject [in
question]."  Wendell v. Attorney Gen., 394 Mass. 518, 524
(1985).  Municipalities enjoy "considerable latitude" in this
regard.  Bloom v. Worcester, 363 Mass. 136, 154 (1973).  There
must be a "sharp conflict" between the ordinance or bylaw and
the statute before a local law is invalidated.  Id.  Such a
conflict "appears when either the legislative intent to preclude
local action is clear, or, absent plain expression of such
intent, the purpose of the statute cannot be achieved in the

face of the local by-law." Grace v. Brookline, 379 Mass. 43, 54
(1979).

Legislative intent to preclude local action can be express
or inferred. St. George Greek Orthodox Cathedral of W. Mass.,
Inc. v. Fire Dep't of Springfield, 462 Mass. 120, 126 (2012).
When express, the task of determining the inconsistency between
a local enactment and a State law is relatively easy. See
Wendell, 394 Mass. at 524. More difficult are the instances
when the Legislature is silent on the issue of local regulation
and a party challenging a local enactment asserts that "a
legislative intent to bar such local action should be inferred
in all the circumstances." Id. When "legislation on a subject
is so comprehensive that an inference would be justified that
the Legislature intended to preempt the field," a municipal law
cannot stand. Id. See Anderson v. Boston, 376 Mass. 178, 186
(1978) (construing campaign finance laws as "preempting any
right which a municipality might otherwise have to appropriate
funds for the purpose of influencing the result on a referendum
question"). "In a close case, the considerations influencing
the decision depend on the particular circumstances and a
perception of the extent to which the Legislature has or has not
made a preemptive intent clear. In such an analysis, it is not
inappropriate to take note of what has or has not been

traditionally a matter of local regulation." <u>Wendell</u>, 394 Mass.
at 525.

The plaintiffs have identified three statutes that they
argue are in conflict with the ordinances:  G. L. c. 244, the
Massachusetts foreclosure statute; G. L. c. 21E, the
Massachusetts Oil and Hazardous Material Release Prevention Act
(OHMRPA); and G. L. c. 111, §§ 127A-127L, the State sanitary
code.  We address each in turn.

a.  <u>Massachusetts foreclosure statute</u>.  The plaintiffs
argue that the foreclosure statute preempts the foreclosure
ordinance.  The First Circuit has asked us also to consider
whether the foreclosure statute preempts the mediation
ordinance.  As we explain, we conclude that the foreclosure
statute preempts the mediation ordinance in whole but find no
preemption of the foreclosure ordinance.

i.  <u>Mediation ordinance</u>.  General Laws c. 244 establishes
three means by which the equity of redemption of a mortgage may
be foreclosed.  They are foreclosure (1) by action, G. L.
c. 244, §§ 3-10; (2) by entry and possession, G. L. c. 244,
§§ 1, 2; or (3) by sale under the power of sale in a mortgage,
G. L. c. 244, §§ 11-17C.  General Laws c. 244, § 35A, as amended
by St. 2010, c. 258, § 7, gives a mortgagor of residential real
property in the Commonwealth 150 days to cure a payment default
before foreclosure proceedings may be commenced.  A foreclosing

mortgagee may reduce the 150-day period to ninety days by certifying that it has engaged "in a good faith effort to negotiate a commercially reasonable alternative to foreclosure . . . involv[ing] at least 1 meeting, either in person or by telephone, between [the parties or their representatives,]" and that the meeting was not successful. G. L. c. 244, § 35A (b). A good faith effort requires the mortgagee to consider the mortgagor's current circumstances, an analysis of the net present value of a modified mortgage loan compared to the "anticipated net recovery following foreclosure[,] and . . . the interests of the creditor." G. L. c. 244, § 35A (c). Should the good faith effort fail, the mortgagee must provide the mortgagor with an affidavit setting forth "the time and place of the meeting, parties participating, relief offered to the borrower, a summary of the creditor's net present value analysis and applicable inputs of the analysis and certification that any modification or option offered complies with current [F]ederal law or policy." G. L. c. 244, § 35A (f).

A comparison of the foreclosure statute and the mediation ordinance reveals similar attempts to give mortgagees an incentive to negotiate with the mortgagors before proceeding to foreclose. The city contends that the mediation ordinance complements and does not conflict with the foreclosure statute because a mortgagee could comply with both laws. We disagree.

The Legislature's decision to utilize the proverbial "carrot" of a shorter right-to-cure period trumps the city's choice of the "stick" of a daily fine.  Furthermore, the ordinance by its own terms does not allow a mortgagee to proceed with foreclosure before obtaining a certificate of good faith mediation, a direct impingement on the process of foreclosure.

Mortgage foreclosure regulation traditionally has been a matter of State, and not local, concern.  See Walsh, The Finger in the Dike:  State and Local Laws Combat the Foreclosure Tide, 44 Suffolk U. L. Rev. 139, 180-187 (2011) (reviewing legal challenges to efforts by municipalities to regulate mortgage foreclosure process).  See BFP v. Resolution Trust Corp., 511 U.S. 531, 541-542 (1994) (noting traditional State-level management of foreclosure).  The mediation ordinance alters what the Legislature determined, as a matter of policy, to be the just medium between the parties involved in the contemplation of a mortgage foreclosure.  By so doing, the ordinance necessarily "frustrate[s] the purpose" of the foreclosure statute.  Wendell, 394 Mass. at 529.

The Legislature's amendment of the foreclosure statute in 2012 provides further support for our conclusion that the foreclosure process is wholly a matter of State regulation absent an expression of a clear intent to allow local regulation.  General Laws c. 244, § 35B, inserted by St. 2012,

c. 194, § 2, prohibits a mortgagee from proceeding with foreclosure by sale if the mortgage loan at issue in the foreclosure qualifies as a "certain mortgage loan," as defined by G. L. c. 244, § 35B (a). If the loan qualifies, the mortgagee must conduct an analysis of whether the mortgagor is capable of paying a modified mortgage loan, and it must offer the mortgagee any such identified loan. See G. L. c. 244, § 35B (b). This analysis and offer, if any is forthcoming, constitute objective evidence of a good faith effort to prevent foreclosure. Id. We think the differing treatment of lenders based on the particular circumstances of the mortgage loan in question indicates that the Legislature considered and rejected other possible means of regulation. Accordingly, we discern a legislative intent to occupy the field to the exclusion of other options -- including further regulation at the local level.

    ii. Foreclosure ordinance. The foreclosure statute does not preempt the foreclosure ordinance. As we stated above, G. L. c. 244 establishes procedures by which the equity of redemption in a mortgage may be foreclosed. The foreclosure ordinance does not impact that process. Although a mortgagee's duty to maintain and repair arises under the ordinance and other liabilities may arise from actions required under the ordinance, nothing in the ordinance affects the procedures for foreclosing the equity of redemption. It is immaterial for purposes of

liability under the ordinance that the ordinance considers the foreclosure process initiated at a different moment than the statute because the ordinance does not purport to have any legal effect on the statutory foreclosure process.[5]   We therefore conclude that the foreclosure ordinance does not conflict with the foreclosure statute.[6]

   b.   Massachusetts Oil and Hazardous Material Release Prevention Act.   As we explain, we determine that the foreclosure ordinance is inconsistent with G. L. c. 21E, the OHMRPA.   The foreclosure ordinance requires an "owner of a vacant and/or foreclosing property" to "[r]emove from the property, to the satisfaction of the fire commissioner, hazardous material as that term is defined in Massachusetts General Laws, chapter 21K, as that statute may be amended from time to time . . . ."   The plaintiffs argue that the foreclosure ordinance's definition of "owner" is broader than the definition

---

   [5] As discussed infra, where the mortgage authorizes the mortgagee to make repairs upon the mortgagor's failure to do so, the mortgagee is deemed to have initiated the foreclosure process.

   [6] The foreclosure ordinance also is not inconsistent with G. L. c. 266, § 120, the criminal trespass statute.   The criminal trespass statute applies to those who enter "without right."   G. L. c. 266, § 120.   A mortgagee may have a right to enter property either under the terms of the mortgage or under G. L. c. 244, § 9.

included in the OHMRPA.[7]  In the plaintiff's view, this
overbreadth directly places the foreclosure ordinance squarely
in conflict with a clearly stated legislative policy.  We agree.

The OHMRPA is a statute "drafted in a comprehensive fashion
to compel the prompt and efficient cleanup of hazardous material
and to ensure that costs and damages are borne by the
appropriate responsible parties.  To that end, the [Department
of Environmental Quality Engineering] has promulgated extensive
regulations . . . for purposes of implementing, administering,
and enforcing [the OHMRPA]." Taygeta Corp. v. Varian Assocs.,
436 Mass. 217, 223 (2002).  Under the OHMRPA, a secured lender
will "not be deemed an owner or operator with respect to the
site securing the loan" if certain conditions are met.  G. L.
c. 21E, § 2 (c).  However, this exemption from liability under
OHMRPA applies only to "releases and threats of release that
first begin to occur before such secured lender acquires
ownership or possession of the site . . . ." G. L. c. 21E,
§ 2 (c) (1).  "Nothing in this definition shall relieve a
secured lender of any liability for a release or threat of
release that first begins to occur at or from a site . . .
during the time that such secured lender has ownership or

---

[7] The definition of "owner" in G. L. c. 21K references the
Massachusetts Oil and Hazardous Material Release Prevention Act
(OHMRPA).  Both c. 21K, which addresses the mitigation of
hazardous materials, and the OHMRPA utilize the same definition
of "hazardous material."

possession of such site . . . for any purpose."  Id.
Furthermore, "[n]otwithstanding any other provision of this
definition, a secured lender shall be deemed an owner or
operator of an abandoned site . . . if such secured lender . . .
held ownership or possession of such site . . . immediately
prior to such abandonment."  G. L. c. 21E, § 2 (c) (2).

     The plaintiffs argue that the foreclosure ordinance
forcibly exposes them to liability under the OHMRPA if, in
complying with the mandate of the ordinance, they enter a
property and become mortgagees in possession during or after
which a release or threat of release of hazardous material
occurs.  The imposition of liability in such circumstances would
defeat the safe harbor for secured lenders provided by the
Legislature.  We agree.

     The OHMRPA is a "comprehensive" statute.  Taygeta Corp.,
436 Mass. at 223.  "Legislation which deals with a subject
comprehensively . . . may reasonably be inferred as intended to
preclude the exercise of any local power or function on the same
subject because otherwise the legislative purpose of that
statute would be frustrated."  Bloom, 363 Mass. at 155.  Here,
we can infer that the Legislature has decided that secured
lenders not in possession (nor previously in possession) of a
site should not be liable for any hazardous material releases at
that site.  The foreclosure ordinance alters that calculus by

requiring mortgagees not yet in possession to enter the property and assume possession. In so doing, a secured lender may become liable under the OHMRPA through compliance with the foreclosure ordinance. As such, the foreclosure ordinance is inconsistent with the OHMRPA.

The city argues that the very language of the ordinance eliminates any inconsistency between it and the OHMRPA because the ordinance does not apply to owners "exempt from such actions by Massachusetts General Laws." We are unpersuaded by this argument. "The existence of legislation on a subject . . . is not necessarily a bar to the enactment of local ordinances and by-laws exercising powers or functions with respect to the same subject[,]" but can be a bar when "the Legislature has . . . [impliedly] . . . forbidden the adoption of local ordinances and by-laws on that subject." Del Duca v. Town Adm'r of Methuen, 368 Mass. 1, 11 (1975), quoting Bloom, 363 Mass. at 156. Simply put, a municipality has no regulatory power in a field already wholly occupied by the State unless explicitly granted such power to regulate by the statute itself. The city cannot exempt a secured lender from the foreclosure ordinance if it has no power to include the lender. See N.J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 47:11, at 326-327 (7th ed. rev. 2014) ("A true statutory exception exists only to exempt something which would otherwise be covered by an act").

    c.  <u>State sanitary code</u>.  The plaintiffs challenge the foreclosure ordinance by claiming it is inconsistent with the Sanitary code and the regulations promulgated under it, 105 Code Mass. Regs. § 400 (1993), together known as the State sanitary code (code).  "General Laws c. 111, §§ 127A-127N, reflect a comprehensive legislative attempt to effectuate compliance with minimum health and safety standards for residential premises." <u>Negron</u> v. <u>Gordon</u>, 373 Mass. 199, 202 (1977).  A local board of health is permitted "to adopt such rules and regulations as, in its opinion, may be necessary for the particular locality under its jurisdiction; provided, such rules and regulations do not conflict with the laws of the commonwealth or the provisions of the code." G. L. c. 111, § 127A.  Enforcement of the code and any local regulations falls to the local board of health or the Department of Public Health by service of an order on the owner of a property.  <u>Id</u>.  105 Code Mass. Regs. § 400.200-400.300 (1993).  The local board of health and the Department of Public Health, as well as a tenant, also may petition a court to enforce the requirements of the code.  G. L. c. 111, §§ 127A, 127C.  Among the available remedies are criminal or civil injunctive relief, correction of the violation by the board itself at the expense of the owner, appointment of a receiver, or condemnation and demolition of the building.  G. L. c. 111,

§§ 127A, 127B, 127I.  105 Code Mass. Regs. § 400.700(B) (1993).
105 Code Mass. Regs. §§ 410.910, 410.950-410.960 (2007).

The appointment of a receiver, while a familiar instrument
of equity, is an extraordinary remedy.  Perez v. Boston Hous.
Auth., 379 Mass. 703, 735-736 (1980).  General Laws c. 111,
§ 127I, "set[s] forth circumstances that permit a court to
appoint a receiver (i.e., when it 'may' do so) as well as those
circumstances when appointment of a receiver is mandated (i.e.,
when it 'shall' do so)."  Boston v. Rochalska, 72 Mass. App. Ct.
236, 243 (2008).  Section 127I "require[s] the appointment of a
receiver to undertake remedial action when there are ongoing
sanitary code violations in an occupied building 'and the court
determines that such appointment is in the best interest of the
occupants residing in the property,' but mak[es] the appointment
discretionary when the building is unoccupied or, if occupied,
when the best interests of occupants do not require
appointment."  Id. at 244.

The foreclosure ordinance amalgamates two separate
enforcement procedures envisioned in the State sanitary code
into a single regulatory mechanism:  the use of the surety bond
and direct entry by an enforcement authority.  Under the State
sanitary code, an enforcement authority initially can only issue
an order to the owner (as defined by 105 Code Mass. Regs.
§ 410.020 [2007]) or petition a court for enforcement.  Only

after "a failure to comply with an order . . . results in a condition which endangers or materially impairs the health or well-being of the occupant or the public" may an enforcement authority cause "such proper cleaning or repair and charge the responsible person or persons as hereinbefore provided with any and all expenses incurred." 105 Code Mass. Regs. § 410.960(A) (2007). The code requires only receivers to post a bond, not owners subject to the code. G. L. c. 111, § 127I. Even then, receivers are required to post a bond only after appointment by a court of competent jurisdiction. Id.

The foreclosure ordinance requires an owner, subject only to an administrative order and fine followed by charged expenses under the code, to post a bond to ensure compliance with the ordinance. The building commissioner may draw on the bond after failure of an owner to pay within seven days the expenses of a direct entry by the building commissioner or his agents. The code envisions that expenses for such a direct entry can be recouped by an action at law or by placing a lien on the property. 105 Code Mass. Regs. § 410.950(D) (2007). The foreclosure ordinance places a heavier burden on an owner than does the code to ensure enforcement of essentially the same mandates by requiring an owner to post a bond where the code would require none. "Given the comprehensiveness of the [code] and the remedies provided therein," it is inconsistent with the

code for a municipality to require a surety bond of an owner in
situations where the code would require none.  See Boston Gas
Co. v. Newton, 425 Mass. 697, 704-705 (1997).  In addition, the
code's provision for the use of a surety bond limits the city's
power to require such a bond in any other context of code
enforcement.  See 105 Code Mass. Regs. § 400.015 (1993) ("Nor
should the existence of the State Sanitary Code limit or
otherwise affect the power of any health authority with respect
to any matter for which the State Sanitary Code makes no
provision").  The city, by the terms of the code, may require
only a surety bond in the manner the code allows.  The
foreclosure ordinance requires a surety bond in circumstances
different from those of the code.  Thus the foreclosure
ordinance conflicts with the code.[8]

    4.  Lawful fee.  The plaintiffs challenge the foreclosure
ordinance by characterizing it as an unlawful tax instead of a
lawful fee.  The city imposes a charge on foreclosing mortgagees

---

    [8] Although we determine that State law preempts the
foreclosure ordinance, the effect of this preemption vis-à-vis a
general severability clause is not before us.  "Neither a trial
judge nor this court can consider such alleged ordinances unless
they are put in evidence."  Fournier v. Central Taxi Cab, Inc.,
331 Mass. 248, 249 (1954), and cases cited.  Nor are local
ordinances "an appropriate subject of judicial notice."
Lawrence v. Falzarano, 380 Mass. 18, 25 n.10 (1980).  See Mass.
G. Evid. § 202(c) (2013).  We note that the foreclosure
ordinance, unlike the mediation ordinance, does not have a
severability provision specific to itself.

to register the property with the city.[9]  "A municipality does
not have the power to levy, assess, or collect a tax unless the
power to do so in a particular instance is granted by the
Legislature."  Silva v. Attleboro, 454 Mass. 165, 168 (2009),
quoting Commonwealth v. Caldwell, 25 Mass. App. Ct. 91, 92
(1987).  The plaintiffs bear the burden of demonstrating the
invalidity of the exaction.  Id.  The operation of the exaction,
rather than the specific language used to describe it,
ultimately demonstrates its nature.  Id.  Fees share certain
common characteristics that distinguish them from taxes and
establish the lens through which to determine their nature.
Doe, Sex Offender Registry Bd. No. 10800 v. Sex Offender
Registry Bd., 459 Mass. 603, 610 (2011) (Doe No. 10800).
Utilizing these characteristics, we arrive at the conclusion
that the monetary exaction at issue here is a lawful fee, and
not a tax.

    a.  Particularized benefit.  Fees "are charged in exchange
for a particular governmental service which benefits the party
paying the fee in a manner 'not shared by other members of
society.'"  Emerson College v. Boston, 391 Mass. 415, 424
(1984), quoting National Cable Television Ass'n v. United
States, 415 U.S. 336, 341 (1974).  In Doe No. 10800, we examined

---

[9] Because we determine that the city's requirement that a
registrant post a bond is preempted by State law, we analyze
this question as if the city charged a fee directly instead of
retaining part of the bond.

whether an exaction that the Legislature authorized from sex
offenders who were required to register with a supervisory board
constituted a regulatory fee or tax.  459 Mass. at 605, 610-615.
There, we further affirmed our reasoning in Silva, 454 Mass. at
170, that "the particularized benefit provided in exchange for
the [regulatory fee] is the existence of the regulatory scheme
whose costs the fee serves to defray."  Such fees "serve
regulatory purposes either 'directly by, for example,
deliberately discouraging particular conduct by making it more
expensive,' or indirectly by defraying an agency's regulation-
related expenses."  Id. at 171, quoting Nuclear Metals, Inc. v.
Low-Level Waste Mgt. Bd., 421 Mass. 196, 201-202 (1995).

    "In the context of regulatory fees, we construe the term
'benefit' broadly to encompass the provision of particular
governmental services to a group of individuals whose actions
have necessitated the regulatory scheme in the first instance
and who should shoulder the burden of paying for such services.
That this may not be viewed as a 'benefit' to [one subject to
the scheme] in the traditional sense of the word does not
detract from the fact that a governmental entity has provided a
particularized 'service' to individuals who require it."  Doe
No. 10800, 459 Mass. at 611.  The city has stated its belief
that properties in foreclosure are more likely to become
nuisances than other properties and that a downward spiral of

urban blight can occur as nuisance properties in foreclosure affect the values of other properties around it, thereby increasing the likelihood of foreclosure. The foreclosure ordinance attempts to regulate this phenomenon by addressing the period of time between when a mortgagor has stopped tending to the property (due either to the futility of the exercise in the face of foreclosure and unavoidable eviction or to the fact that the property is already vacant with no party responsible for its care) and when the mortgagee or new occupant comes into possession. While the act of foreclosing by mortgagees should not be equated with the acts of those subject to the regulatory scheme in Doe No. 10800, foreclosure is nevertheless the operation that triggers the conditions giving rise to the perceived necessity for the regulatory scheme. That this regulatory scheme is not viewed as a benefit by the plaintiffs does not detract from the fact that the city provides a particularized service to the plaintiffs in the form of maintaining property values of their loan collateral through enforcement of the foreclosure ordinance after foreclosure has commenced. See Nuclear Metals, Inc., 421 Mass. at 205 ("It is appropriate that the entities which generate low-level radioactive waste (and not the taxpayers of the Commonwealth) should shoulder costs associated with protecting the general public from the hazards posed by the waste").

b. <u>Costs</u>. Fees, unlike taxes, "are collected not to raise
revenues but to compensate the governmental entity providing the
services for its expenses." <u>Emerson College</u>, 391 Mass. at 425.
Here, the fee is paid into "an account for expenses incurred in
inspecting, securing, and marking said building and other such
buildings that are not in compliance with this Section." See
<u>id</u>. at 427 (stating deposit of exaction into general fund
nondecisively weighs in favor of tax, not fee). "The critical
question is whether the fees are reasonably designed to
compensate an entity for its anticipated regulatory expenses."
<u>Doe No. 10800</u>, 459 Mass. at 612. In reviewing this question,
"reasonable latitude must be given to the agency in fixing
charges to cover its anticipated expenses in connection with the
services to be rendered." <u>Southview Coop. Hous. Corp.</u> v. <u>Rent
Control Bd. of Cambridge</u>, 396 Mass. 395, 403 (1985). Such
charges should "not be scrutinized too curiously even if some
incidental revenue were obtained." <u>Id</u>., quoting <u>Opinion of the
Justices</u>, 250 Mass. 591, 602 (1924). "Relevant expenses include
both the direct and the indirect or incidental costs associated
with the particular government service." <u>Doe No. 10800</u>, 459
Mass. at 613.

The plaintiffs argue that the funds that do not apply
directly to the registered compliant properties are utilized to
secure other, noncompliant properties and are never recovered by

the original payor.   These excess monies, therefore, indicate
that the exaction is excessive to the costs of the benefit.[10]
This argument passes over the fact that the foreclosure
ordinance envisions that the expenditures of the city in
entering and securing a noncompliant property will indeed be
initially financed by a portion of the administrative fee from
the compliant properties paid into an account to fund the city's
actions in securing the noncompliant properties but that
ultimately the penalties that other properties will incur
through noncompliance will cover those expenditures of the city.
This initial financing of a portion of the regulatory scheme
beyond the simple processing and registration of a compliant
property is "an indirect or incidental cost[] associated" with
the foreclosure ordinance.  Doe No. 10800, 459 Mass. at 613.

     c.  Voluntariness.  The parties agree that the exaction at
issue in the foreclosure ordinance is involuntarily paid.  We
have "consistently given less weight to the voluntariness
factor" in the context of regulatory fees.  Silva, 454 Mass. at
172.  The purpose of the foreclosure ordinance is "to promote

---

     [10] The foreclosure ordinance does not specify the amount of
the administrative fee.  Therefore, although we discuss the role
of the exaction relative to costs and ultimately determine that
the exaction is a fee, we can make no further determination
whether the exaction unlawfully raises revenue or,
alternatively, compensates the city on the record before us.  We
note that the mere fact that a fee creates some revenue does not
transform the fee into a tax.  See Opinion of the Justices, 250
Mass. 591, 602 (1924).

the health, safety and welfare of the public, to protect and preserve the quiet enjoyment of occupants, abutters and neighborhoods, and to minimize hazards to public safety personnel inspecting or entering such properties." Exactions founded upon the police power to regulate particular activities are regulatory fees. See id. at 168. Accordingly, in this context, the issue of voluntariness "is of no relevance in determining whether that charge is a fee or a tax." Id. at 172.

In conclusion, for the aforementioned reasons, we determine that the city's exaction from those subject to the foreclosure ordinance would be a lawful fee, rather than a tax.[11] Accordingly, we answer the second certified question in the negative.

We recognize that the city of Springfield has attempted to address the serious problem of urban blight within its borders through these ordinances. Although we conclude that the city may not achieve its goal by ordinance as it has here attempted, a solution may be provided through the Legislature.

The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of this court, to the clerk of

---

[11] The plaintiffs also argue that the city lacks the statutory authorization to impose this exaction. The plaintiffs point to nothing in the record to support this contention. We assume, without deciding, that the city does have this authority pursuant to G. L. c. 40, § 22F, and that the city has duly adopted this provision.

the United States Court of Appeals for the First Circuit, as the
answers to the questions certified, and will also transmit a
copy to each party.

So ordered.

Easthampton Savings Bank

*vs.*

Springfield

**Certified Copy of the Opinion**

OF THE

**Supreme Judicial Court**

*Commonwealth of Massachusetts.*

*Boston, December 19, 2014*

*I Certify the annexed to be a true copy of the opinion of the Supreme Judicial Court in the case of*

Easthampton Savings Bank *vs.* Springfield

decided on the *nineteenth* day of *December*, 2014

Deputy Reporter of Decisions.

Francis V. Kenneally, Clerk
Supreme Judicial Court for the Commonwealth
John Adams Courthouse, Suite 1400
One Pemberton Square
Boston, MA 02108-1724



UNITED STATES POSTAGE
PITNEY BOWES
02 1M    $ 02.03⁰
0004277181    DEC 22 2014
MAILED FROM ZIP CODE 02108

John Joseph Moakley
United States Courthouse
1 Courthouse Way, Suite 2500
Boston, Ma   02210
Attn: Stephen B Turner, Esquire

USMS SCREENED